Case No. 25-5169

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

_____

MARK F. BERGENS,

*Plaintiff-Appellant,*

v.

DIVERSE CONCEPTS, LLC, ISLAND AMENITIES, LLC, and SMOKY
MOUNTAIN BLUE MOOSE, LLC,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Eastern District of Tennessee (Case No. 3:23-cv-00304)
The Honorable Clifton L. Corker

_____

**BRIEF FOR APPELLANT**

_____

Emma Freeman
APOLLO LAW LLC
1000 Dean Street
Suite 101
Brooklyn, NY 11238

Adam W. Hansen
 *Counsel of Record*
APOLLO LAW LLC
333 Washington Avenue North
Suite 300
Minneapolis, MN 55401
(612) 927-2969
adam@apollo-law.com

[*additional counsel listed on inside cover*]

David A. Burkhalter, II
D. Alexander Burkhalter, III
Zachary J. Burkhalter
BURKHALTER LAW FIRM, P.C.
111 South Central Street
Knoxville, TN 37901

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 25-5169          Case Name: Bergens v. Diverse Concepts, LLC et al.

Name of counsel: Adam W. Hansen

Pursuant to 6th Cir. R. 26.1, Appellant Mark Bergens

*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on _____ July 23, 2025 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Adam W. Hansen

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08

Page 1 of 2

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ............................................................ 1

STATEMENT OF THE ISSUES ............................................................... 1

INTRODUCTION .................................................................................. 1

STATEMENT OF THE CASE ................................................................. 6

I.    FACTUAL BACKGROUND ............................................................ 6

    A.    Appellees Operate the Timberwood Grill and Smoky Mountain Blue Moose Restaurants in Tennessee .................. 6

    B.    Bergens, an Experienced General Manager in the Restaurant Industry, Joined Diverse in 2022 ........................ 7

    C.    Bergens Reported to a Handful of Supervisors and Worked with Other Assistant Managers ............................... 8

    D.    General Managers and Assistant General Managers Run Restaurants, Manage Employees and Guests, and Fill In for Other Workers As Needed ..................................... 8

    E.    Bergens Worked as an Assistant Manager at the Timberwood Grill, But Took On Many General Manager Duties in Anticipation of Assuming the General Manager Role at the Blue Moose Alcoa ............................. 10

    F.    Bergens's Job Performance Was Outstanding ..................... 11

    G.    Diverse Promoted Bergens to General Manager of the New Blue Moose Alcoa Restaurant ...................................... 12

    H.    On August 22, 2022, Bergens Suffered a Stroke ................. 13

    I.    Bergens Left the Hospital After a Week, And His Doctors Expected Him to Make a Full Recovery ................. 14

    J.    Bergens Returned to Work After Two Weeks Off, and Performed Well With Only Minimal Scheduling Accommodations ................................................................. 15

    K.    After Bergens Returned to Work, Everything in the Employment Relationship Changed. His Coworkers

Called Him Ableist Names. His General-Manager Training Dramatically Slowed. He Was Cut Out of Planning Discussions About the Blue Moose Alcoa. MacDonald and Delahunt Repeatedly Questioned Bergens's Fitness ......................................................18

(1)  Bergens's colleagues and supervisor began making vague complaints about Bergens's performance .........18

(2)  Other managers started calling Bergens ableist names, including the "one arm bandit." ......................19

(3)  Bergens's training largely ceased ...............................20

(4)  Bergens was excluded from discussions about opening the Blue Moose Alcoa...................................21

(5)  Bergens faced frequent questioning from MacDonald and Delahunt about his abilities.............21

(6)  Diverse made staffing decisions that were inconsistent with Bergens assuming the general manager role ...............................................................23

L.  The Moonshine Incident ......................................................25

M.  Word of King's Prank Traveled Up the Chain......................30

N.  MacDonald and Delahunt Conducted No Investigation ......31

O.  MacDonald and Delahunt Fired Bergens .............................32

P.  Employees Engaging in Similar Conduct Were Treated Far Less Harshly Than Bergens .............................................33

II.  PROCEDURAL BACKGROUND .................................................37

SUMMARY OF THE ARGUMENT .......................................................39

STANDARD OF REVIEW......................................................................41

ARGUMENT ...........................................................................................42

I.  A REASONABLE JURY COULD FIND THAT DIVERSE FIRED BERGENS BECAUSE OF HIS DISABILITY...................42

A.    The ADA Prohibits Discrimination Because of a Disability ...................................................................... 42

B.    Diverse's Stated Reason for Firing Bergens Was Pretextual: It Fired Him Because of His Disability ............ 46

    (1)    Diverse's proffered justification has no basis in fact ................................................................................ 46

    (2)    Diverse fired Bergens because of his disability, not solely the moonshine prank .......................................... 48

        *(a)    The close temporal proximity between Bergens's stroke and his termination shows pretext* ...................................................... 48

        *(b)    The hostile atmosphere at Diverse shows both pretext and discrimination* .................................. 49

        *(c)    Diverse's proffered justification was not its sole motivation because the intention to oust Bergens formed before the moonshine prank* ...... 51

        *(d)    Diverse conducted no investigation and failed to follow its progressive-discipline policy before firing Bergens* ........................................... 54

    (3)    Diverse offered insufficient reasons to justify firing Bergens because it treated similarly situated employees more favorably ........................................... 55

        *(a)    Diverse never fired Robert Cartree for dumping old bottle caps into the same backpack it fired Bergens for reaching in* ........... 57

        *(b)    Diverse never fired Daniel King for sexually harassing his subordinates* .................................. 58

        *(c)    Diverse never fired Jack Coppinger for getting one of his subordinates pregnant. Instead, it promoted him* ..................................... 61

CONCLUSION ............................................................................... 61

CERTIFICATE OF COMPLIANCE ...........................................................

ADDENDUM ..............................................................................................

CERTIFICATE OF SERVICE.......................................................................

## TABLE OF AUTHORITIES

### CASES

*Bennett v. Hurley Medical Ctr.*,
86 F.4th 314 (6th Cir. 2023)............................................................. 44

*Berry v. Crestwood Healthcare LP*,
84 F.4th 1300 (11th Cir. 2023).................................................... 5, 45

*Blizzard v. Marion Tech. Coll.*,
698 F.3d 275 (6th Cir. 2012) ............................................................ 53

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) ............................................................. 4, 43, 45

*Briggs v. Univ. of Cincinnati*,
11 F.4th 498 (6th Cir. 2021)............................................................. 41

*Chattman v. Toho Tenax Am., Inc.*,
686 F.3d 339 (6th Cir. 2012) ............................................................ 57

*Chen v. Dow Chem. Co.*,
580 F.3d 394 (6th Cir. 2009) .............................................. 45–46, 48

*C.S. v. McCrumb*,
135 F.4th 1056 (6th Cir. 2025)........................................................ 41

*Demyanovich v. Cadon Plating & Coating, LLC*,
747 F.3d 419 (6th Cir. 2014) ........................................................... 43

*Ercegovich v. Goodyear Tire & Rubber Co.*,
154 F.3d 344 (6th Cir. 1998) ........................................................... 50

*Ferrari v. Ford Motor Co.*,
826 F.3d 885 (6th Cir. 2016) ........................................................... 44

viii

*Gohl v. Livonia Pub. Schs. Sch. Dist.*,
  836 F.3d 672 (6th Cir. 2016) ......................................................... 44

*Hamilton v. Gen. Elec. Co.*,
  556 F.3d 428 (6th Cir. 2009) ............................................... 5, 51, 53

*Hannon v. Louisiana-Pacific Corp.*,
  784 F. App'x 444 (6th Cir. 2019) ................................................... 46

*Holiday v. City of Chattanooga*,
  206 F.3d 637 (6th Cir. 2000) ......................................................... 44

*Kean v. Brinker Int'l, Inc.*,
  140 F.4th 759 (6th Cir. 2025) ................................................... 54–55

*Keith v. Cnty. of Oakland*,
  703 F.3d 918 (6th Cir. 2013) ......................................................... 43

*Lewis v. Humboldt Acquisition Corp., Inc.*,
  681 F.3d 312 (6th Cir. 2012) ..................................................... 4, 42

*McDonald v. Union Camp Corp.*,
  898 F.2d 1155, 1161 (6th Cir. 1990) .............................................. 50

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ...........................................38-39, 44–45, 57, 60

*McNeal v. City of Blue Ash*,
  117 F.4th 887 (6th Cir. 2024) ....................................................... 56

*Miles v. S. Cent. Hum. Res. Agency, Inc.*,
  946 F.3d 883, 888 (6th Cir. 2020) ................................................. 45

*Monette v. Elec. Data Sys. Corp.*,
  90 F.3d 1173, 1182 (6th Cir. 1996) ................................................ 44

*Moore v. Coca-Cola Bottling Co. Consol.*,
  113 F.4th 608 (6th Cir. 2024) ....................................................... 56

ix

*Moran v. Al Basit LLC*,
    788 F.3d 201 (6th Cir. 2015) ........................................................ 41

*Ortiz v. Werner Enterps., Inc.*,
    834 F.3d 760 (7th Cir. 2016) ........................................................ 46

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133, 150 (2000) .............................................................. 58

*Risch v. Royal Oak Police Dep't*,
    581 F.3d 383, 393 (6th Cir. 2009) ................................................ 50

*Seeger v. Cincinnati Bell Tel. Co.*,
    681 F.3d 274 (6th Cir. 2012) ........................................................ 49

*Smith v. Chrysler Corp.*,
    155 F.3d 799 (6th Cir. 1998) ........................................................ 43

*Spratt v. FCA US LLC*,
    812 F. App'x 348 (6th Cir. 2020) ........................................ 57–58, 61

*U.S. Postal Servs. Bd. of Governors v. Aikens*,
    460 U.S. 711 (1983) ...................................................................... 45

*Willard v. Huntington Ford, Inc.*,
    952 F.3d 795 (6th Cir. 2020) ........................................................ 41

## STATUTES

28 U.S.C. § 1291 ................................................................................ 1

28 U.S.C. § 1331 ................................................................................ 1

28 U.S.C. § 1367 ................................................................................ 1

42 U.S.C. § 12101 *et seq* .............................................................. 1, 42

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellant respectfully requests oral argument in this case, which presents important questions about causation and pretext in disability-discrimination cases. Oral argument will give this Court a valuable opportunity to ask questions about the record and clarify the parties' arguments.

## STATEMENT OF JURISDICTION

The district court had federal-question jurisdiction under 28 U.S.C. § 1331 because this case arose under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Complaint, R.1 at 18. The district court had jurisdiction over the parallel state-law claims because they arose out of the same facts as the ADA claims and are therefore part of the same case or controversy. 28 U.S.C. § 1367; Complaint, R.1 at 18.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291. The district court entered final judgment on February 3, 2025. Entry of Judgment, R.62, PageID.1779. Appellant filed a notice of appeal on February 28, 2025. Notice of Appeal, R.64, PageID.1789. This appeal is from a final judgment disposing of all parties' claims.

## STATEMENT OF THE ISSUES

Whether the district court erred when it concluded that no reasonable jury could find that Appellees fired Mark Bergens because of his disability where they subjected him to near-constant ableist comments and questioned his abilities after Bergens suffered a stroke that immobilized his right arm.

## INTRODUCTION

When Mark Bergens suffered a stroke on the job, he expected his colleagues to rally around him. Instead, they turned their backs on him. They complained about his performance and called him names. They cut him out of plans to lead a new venture. And when a convenient excuse

1

came their way, they fired him. This is a paradigmatic case of disability discrimination. The district court seriously erred in concluding otherwise.

Bergens's story proceeds in two jarringly different parts—split down the middle by his stroke. A restaurant manager with decades of experience, Bergens accepted a new role with Appellees in 2022. He began as an assistant manager at the Timberwood Grill in Pigeon Forge, Tennessee. But Bergens and his employer made plans for Bergens to open a new restaurant, the Blue Moose Alcoa, as the general manager the following year. Bergens began training for that new role immediately.

Bergens excelled in the restaurant with both guests and staff. His performance was universally praised as outstanding. Three months into his tenure, Bergens's employer formally offered him the general-manager role at the new Blue Moose restaurant.

Just three days after he accepted the promotion, though, Bergens suffered a stroke. Although his doctors expected him to recover, Bergens initially lost nearly all mobility in his right arm.

Only two weeks after his stroke, Bergens came back to work. He wore his right arm in a sling. Despite his limitations, Bergens was able to do every part of his job.

But Bergens returned to a vastly changed workplace. Mounting evidence began to suggest that his employer's decisionmakers no longer considered Bergens fit to lead the Blue Moose Alcoa as its general

manager. His coworkers and supervisors repeatedly questioned whether Bergens was up to the job. They called him names, dubbing Bergens the "one arm bandit." Bergens's training for the general manager role slowed and in some areas ceased altogether. Bergens found himself cut out of conversations with his superiors about the opening of the new restaurant. When they did speak to Bergens, they focused almost exclusively on their stereotype-laden concerns about Bergens's condition and ability to do the job. They eventually hired another assistant manager and began grooming him to open the Blue Moose Alcoa.

Little more than a month after returning to work, Bergens found himself the butt of an office prank. Daniel King, a serial workplace jokester, had agreed to pick up two bottles of moonshine for Bergens from a nearby distillery. But King jokingly told Bergens that he'd given the moonshine to another coworker. This prompted a game of hide and seek. Bergens went to the manager's office to look for the moonshine. King went to another room where he could watch a video feed of Bergens going about his search. In the manager's office, Bergens peered inside the coworker's open purse. He felt King's backpack. Feeling an object that could be moonshine, Bergens opened King's bag, reached inside to confirm the moonshine was there, then closed the bag. Bergens didn't take anything. Seeing that Bergens had found his quarry, King joined Bergens in the office and gave Bergens his moonshine. Both laughed about the prank.

3

Within a day, though, video of the moonshine incident reached Bergens's bosses, and their sense of humor was nowhere to be found. They decided to fire Bergens on the spot. They never spoke to Bergens or anyone else involved in the prank before making up their minds. They simply called Bergens and fired him.

This treatment of Bergens was extraordinarily heavy handed. In every comparable case, Bergens's employer followed its progressive-discipline policy. And his employer routinely put up with all manner of misconduct—drinking on the job, sexual harassment, even other pranks involving going into coworkers' bags—without terminating the offending employees. Only Bergens—the newly disabled employee—was singled out for such harsh treatment.

There's only one issue in this appeal: causation. Was Bergens's disability a but-for cause of his termination? The district court said no reasonable jury could find that it was. That holding was grievously wrong.

A handful of closely related legal principles all but decide this case. Plaintiffs claiming disability discrimination don't have "to show that the disability was the 'sole' cause of the adverse employment action." *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 316 (6th Cir. 2012) (en banc). Employers therefore "cannot avoid liability just by citing some other factor that contributed to its challenged employment decision." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020). It follows,

then, that a plaintiff, in attacking his employer's proffered reason as pretextual, need not wholly discredit his employer's stated rationale. *Id.* He must simply "cast[] doubt on the employer's proffered reason as the *only reason* for its action" with evidence sufficient to show that the employer may have *also* relied on an impermissible motive. *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1308 (11th Cir. 2023) (emphasis added).

Bergens easily made that showing. He returned from his stroke only to face demeaning comments and repeated questions about his abilities. His supervisors sidelined him, then hired his replacement. Bergens palpably felt his promotion slipping away. Firing Bergens over the moonshine incident was also manifestly pretextual. Both King and Bergens said it was a joke. But that didn't matter to Bergens's superiors, who fired Bergens without conducting even a rudimentary investigation. Bergens's treatment stands out as even more draconian when compared to other episodes of claimed misconduct. Simply put, Bergens's employer "wait[ed] for a legal, legitimate reason to fortuitously materialize," then "use[d] it to cover up [its] true…motivations for firing" Bergens. *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009). That's "the very definition of pretext." *Id.*

The district court ignored much of this evidence when it granted summary judgment for Appellees. It siloed the evidence it did consider, asking only whether each piece of proof was sufficient to show

5

discriminatory animus. And it repeatedly drew inferences against Bergens. When the evidence is properly viewed as a whole and in the light most favorable to Bergens, a reasonable jury could find that Appellees fired Bergens because of his disability.

The district court's judgment should be reversed.

## STATEMENT OF THE CASE

### I.   FACTUAL BACKGROUND.

#### A.   Appellees Operate the Timberwood Grill and Smoky Mountain Blue Moose Restaurants in Tennessee.

Appellees are three closely related corporations operating in the restaurant industry. Defendants' Responses to Plaintiff's First Set of Interrogatories, R.28, PageID.452–53. Appellee Diverse Concepts, LLC, is a hospitality management group that runs restaurants, hotels, retail stores, and entertainment centers. Defendants' Statement of Undisputed Material Facts, R.26, PageID.138–39. Appellee Island Amenities, LLC owns the Timberwood Grill, a restaurant in Pigeon Forge, Tennessee. Defendants' Statement of Undisputed Material Facts, R.26, PageID.139. Appellee Smoky Mountain Blue Moose, LLC owns the Blue Moose Bar & Grill restaurants in Pigeon Forge and Alcoa, Tennessee. Defendants' Statement of Undisputed Material Facts, R.26, PageID.140. All three Appellees stipulated that they were a "single employer" for purposes of this case. Defendants' Responses to Plaintiff's First Set of Requests for

6

Admission, R.32-1, PageID.528. This brief refers to Appellees collectively as "Diverse."

Many of Diverse's restaurants, including the Timberwood Grill, operate within "the Island," a densely packed entertainment center in Pigeon Forge, Tennessee featuring novelty shops, arcades, amusement rides, bars, and hotels. Delahunt Dep., R.32-3, PageID.663. The Island is a popular "hot spot for tourists." Delahunt Dep., R.32-3, PageID.663.

### B.    Bergens, an Experienced General Manager in the Restaurant Industry, Joined Diverse in 2022.

Appellant Mark Bergens has over two decades of experience as a general manager in the restaurant industry. Bergens Resume, R.32-6, PageID.1232–33.

In early 2022, Bergens applied for a general manager position with Diverse. Bergens Dep., R.32-6, PageID.1106. Paul Delahunt, Diverse's Vice President of Operations, contacted Bergens and told him that there were no open general manager positions. Bergens Dep., R.32-6, PageID.1106. But Delahunt explained that Diverse would soon need a new general manager to run the Blue Moose Alcoa, a restaurant slated to open in the spring of 2023. Statement of Paul Delahunt, R.32-5, PageID.763. Delahunt encouraged Bergens to consider accepting an initial assignment as an assistant manager at the Timberwood Grill, with the opportunity to run the Blue Moose Alcoa as its general manager when

7

that restaurant opened its doors the following year. Bergens Dep., R.32-6, PageID.1106; Delahunt Dep., R.32-3, PageID.646.

Bergens agreed to Delahunt's proposal. Bergens Dep., R.32-6, PageID.1106. He joined the Timberwood Grill in May 2022 as an assistant manager. Delahunt Dep., R.32-3, PageID.646.

## C. Bergens Reported to a Handful of Supervisors and Worked with Other Assistant Managers.

Understanding this case requires some familiarity with the cast of key characters.

After his hiring, Bergens reported directly to Paula Perham, the general manager at the Timberwood Grill. Bergens Dep., R.32-6, PageID.1106–07. Bergens and Perham reported to Scott MacDonald, Diverse's Director of Operations. MacDonald Dep., R.32-5, PageID.941. And MacDonald reported to Delahunt—Diverse's Vice President of Operations and the man who hired Bergens. MacDonald Dep., R.32-5, PageID.928.

Bergens worked alongside Daniel King and Kristy Biddle, two other assistant managers at the Timberwood Grill. Bergens Dep., R.32-5, PageID.1157–58.

## D. General Managers and Assistant General Managers Run Restaurants, Manage Employees and Guests, and Fill In for Other Workers As Needed.

Some background on the general manager and assistant manager roles also helps frame this case.

8

General managers wear many hats at Diverse's restaurants. They oversee dozens of waitstaff, cooks, hosts, dishwashers, and bartenders. Bergens Text Messages, R.28, PageID.247–48. They make schedules, manage inventory, and draft sales and financial reports. Perham Dep., R.32-4, PageID.808. And they pitch in around the restaurant as needed: manning the host stand, preparing meals, carrying food, and bussing tables. Perham Dep., R.32-4, PageID.806. General managers often work long hours. Perham Dep., R.32-4, PageID.806.

General managers need strong interpersonal and problem-solving skills. They must "deal[] with…guests" and "employees that are all different personalities." Perham Dep., R.32-4, PageID.807. They have to "gain the trust of [their] staff." Perham Dep., R.32-4, PageID.805. To do their jobs well, general managers must stay "calm and positive," "pick and choose [their] battles," and "try to be fair." Perham Dep., R.32-4, PageID.805.

Assistant managers perform many of these same duties. They oversee workers, entertain guests, and fill in for other staff around the restaurant. Bergens Dep., R.32-6, PageID.1115–16. One key difference, though: each restaurant has several assistant managers, with each typically assigned to specific areas of the restaurant. Bergens Dep., R.32-6, PageID.1107.

Neither the work of the general manager or the assistant manager is especially physically taxing. While general managers and assistant

9

managers both often work long hours, "[t]he physical part of [the job]…is a lot less than the mental part." Perham Dep., R.32-4, PageID.806; Bergens Dep., R.32-6, PageID.1113.

### E. Bergens Worked as an Assistant Manager at the Timberwood Grill, But Took On Many General Manager Duties in Anticipation of Assuming the General Manager Role at the Blue Moose Alcoa.

Bergens began work as an assistant manager at the Timberwood Grill in May 2022. Delahunt Dep., R.32-3, PageID.646. Like the other assistant managers, Bergens supervised employees, interacted with customers, and helped out around the restaurant as needed. Bergens Dep., R.32-6, PageID.1115-16.

But in keeping with Delahunt's plan to make Bergens the general manager at a new restaurant, Bergens took on a variety of general-manager duties starting on day one. Delahunt Dep., R.32-3, PageID.659.

Unlike the other assistant managers, Bergens worked throughout the entire restaurant. Bergens Dep., R.32-6, PageID.1107. Bergens also received on-the-job general-manager training from Perham, the Timberwood Grill's general manager. Perham Dep., R.32-4, PageID.809–10. Bergens learned the ropes on "ordering," "hiring," "scheduling," and "financials," among other administrative duties. Delahunt Dep., R.32-3, PageID.659. All told, Bergens was trained to "understand all facets of the" restaurant and its "day-to-day operations." Delahunt Dep., R.32-3, PageID.659.

10

It was widely known among employees at the Timberwood Grill that Bergens was undergoing training so he could assume the general manager position at the Blue Moose Alcoa. Perham Dep., R.32-4, PageID.771. Bergens maintained close contact with Delahunt and MacDonald about preparations for opening the Blue Moose Alcoa. Bergens Text Messages, R.28, PageID.228.

### F.    Bergens's Job Performance Was Outstanding.

Bergens's performance at the Timberwood Grill was universally praised as outstanding. Bergens stood out as "very good at [managing] the front of the store" and "talking to guests." Perham Dep., R.32-4 PageID.773. Perham praised Bergens for "go[ing] out of his way to make sure that he could speak with the guests and humor them." Perham Dep., R.32-4 PageID.773. And MacDonald, Diverse's Director of Operations, lauded Bergens as "easy to get along with" and "well spoken." MacDonald Dep., R.32-5, PageID.934. These qualities made Bergens an important "asset" to the company. MacDonald Dep., R.32-5, PageID.934.

Bergens's supervisors especially valued Bergens's strengths in developing and overseeing the newer management team at the Timberwood Grill. When Bergens joined Diverse, the other assistant managers at the Timberwood Grill "were a little bit green." Perham Dep., R.32-4, PageID.772. Perham "needed somebody [with] experience" who would "help develop and strengthen the team." Perham Dep., R.32-4, PageID.772. Bergens did just that. He "worked hard with the team" every

11

day to help make the restaurant "successful." Perham Dep., R.32-4, PageID.774.

### G. Diverse Promoted Bergens to General Manager of the New Blue Moose Alcoa Restaurant.

By August 2022, Bergens had established himself at Diverse as a capable and hardworking restaurant manager. In view of Bergens's excellent performance, Delahunt and MacDonald formally offered Bergens the general manager job at the Blue Moose Alcoa.

Delahunt and MacDonald recognized that Bergens "was performing at the level that would qualify him as a [general manager]." Armbrester Dep., R.32-2, PageID.608; *see* Delahunt Dep., R.32-3, PageID.632–33. As MacDonald explained, Bergens had "done everything that [was] asked of him," and it was time "to go ahead and promote him." MacDonald Dep., R.32-5, PageID.936.

On August 19, 2022, Diverse formally offered Bergens the general manager role at the Blue Moose Alcoa. MacDonald Dep., R.32-5, PageID.935–36. Bergens accepted the promotion. Bergens Dep., R.32-5, PageID.1107.

With the promotion made official, Diverse arranged for Bergens to continue his training at the Blue Moose Pigeon Forge, giving Bergens a chance to become familiar with the Blue Moose concept before the Blue Moose Alcoa opened its doors. Bergens Dep., R.32-6, PageID.1108.

\*\*\*

12

To summarize the story so far: Diverse hired Bergens, an experienced general manager, with an eye toward tapping him to manage a new restaurant. After several months of exceptional work and successful training, Diverse formally promoted Bergens, offering him the new general manager position.

## H.   On August 22, 2022, Bergens Suffered a Stroke.

On August 22, 2022, just three days after receiving the promotion, Bergens suffered a stroke. Bergens Dep., R.32-6, PageID.1108. When Bergens woke that morning, he noticed his right arm "tingling" as though he had "sle[pt] on [his] arm wrong." Bergens Dep., R.32-6, PageID.1109. After arriving for work, Bergens, MacDonald, and Perham were creating financial reports for the Timberwood Grill's daily sales. Bergens Dep., R.32-6, PageID.1109; MacDonald Dep., R.32-5, PageID.1110; Perham Dep., R.32-4, PageID.809. Bergens noticed he was struggling to use the mouse on the restaurant's computer. Bergens Dep., R.32-6, PageID.1110. Perham encouraged Bergens to go to the doctor. Perham Dep., R.32-4, PageID.810.

Bergens went to the hospital, where his condition worsened. He eventually lost mobility in his right arm. Bergens Text Messages, R.28, PageID.241. Bergens remained in the hospital for a week, undergoing extensive tests and consulting specialists to determine the cause of his condition. Bergens Dep., R.32-6, PageID.1111-12; Bergens Text Messages, R.28, PageID.240–42. Bergens's doctors eventually

13

determined that he had suffered a stroke. Bergens Text Messages, R.28, PageID.215-16.

Bergens's supervisors responded graciously to Bergens's hospitalization. MacDonald checked in with Bergens frequently and visited him in the hospital. MacDonald Dep., R.32-5, PageID.948; Bergens Text Messages, R.28, PageID.240. And although Bergens had not yet earned any paid time off, Delahunt arranged for Bergens to receive his normal pay during his absence. Delahunt Dep., R.32-3, PageID.683–84. As Delahunt explained, Bergens "was going to be the GM" of the Blue Moose Alcoa, and Delahunt "wanted to take care of him…so that he would be there" when the time came to open the restaurant. Delahunt Dep., R.32-3, PageID.684.

## I. Bergens Left the Hospital After a Week, And His Doctors Expected Him to Make a Full Recovery.

Bergens left the hospital after a week. Bergens Dep., R.32-6, PageID.1111. He spent the next week seeing doctors and starting his recovery. Bergens Text Messages, R.28, PageID.243.

In the weeks following his stroke, Bergens's right-arm fine-motor skills were severely impaired. Bergens Dep., R.32-6, PageID.1198–99. Bergens learned to write and dress himself with his left arm. Bergens Dep., R.32-6, PageID.1199. Fortunately, Bergens's impairments were largely confined to his right-arm function. Bergens did not suffer any

14

cognitive or speech impairments from the stroke. Perham Dep., R.32-4, PageID.823; King Dep., R.32-1, PageID.513.

Bergens's doctors were confident that, with time, Bergens would make "a full recovery." MacDonald Dep., R.32-5, PageID.955. They ordered Bergens to undergo outpatient physical and occupational therapy four times a week. Bergens Text Messages, R.28, PageID.272. Bergens's doctors cleared him to return to work at the Timberwood Grill immediately and without any restrictions. Bergens Dep., R.32-6, PageID.1113.

MacDonald and Bergens talked about what accommodations Bergens needed to work. MacDonald Dep., R.32-5, PageID.948. Bergens Dep., R.32-6, PageID.1113. They agreed that Bergens should be given flexibility in scheduling—for example, if Bergens needed to go to therapy, he could leave a little early or just be scheduled for a shorter shift. Bergens Dep., R.32-6, PageID.1114. Bergens and MacDonald did not discuss any on-the-job accommodations. Bergens Dep., R.32-6, PageID.1114–16. Bergens felt confident that, with some modest scheduling adjustments, he could do his job. Bergens Dep., R.32-6, PageID.1114–17.

### J. Bergens Returned to Work After Two Weeks Off, and Performed Well With Only Minimal Scheduling Accommodations.

Bergens returned to work at the Timberwood Grill on September 5, 2022—just 14 days after having a stroke. Bergens Dep., R.32-6,

15

PageID.1112. Still in the early days of his recovery, Bergens had only limited mobility in his right arm. Bergens Dep., R.32-6, PageID.1114. Bergens typically wore his right arm in a sling while at work. Bergens Dep., R.32-6, PageID.1114.

Despite his impairment, Bergens did every aspect of his job. Bergens Dep., R.32-6, PageID.1115-16. As Bergens explained, he could "easily count money," "use a computer," and "run food"—he "just used [his] left hand" and it "took [him] longer." Bergens Dep., R.32-6, PageID.1115–16. Bergens "kept visiting tables" and capably interacting with customers and staff through his recovery. Bergens Dep., R.32-6, PageID.1116.

Bergens summed things up this way: "Was my right arm ideal? No, but it wasn't going to stop me." Bergens Dep., R.32-6, PageID.1117. After suffering a stroke, he explained, "[y]ou have to adjust and do what you need to do." Bergens Dep., R.32-6, PageID.1117. Despite his impairment, Bergens "did everything that [he] was supposed to." Bergens Dep., R.32-6, PageID.1112.

As for the scheduling accommodations, they quickly came into some tension with the operational realities of running the restaurant. When Bergens returned to work, he was scheduled for full, ten-hour shifts—not shortened shifts. Bergens Dep., R.32-6, PageID.1113–14. Bergens agreed to work the mid-day shift—the least desirable shift among managers—

16

as that shift naturally tended to involve fewer administrative tasks. Bergens Dep., R.32-6, PageID.1114–15.

Rather than relying on formal accommodations, Bergens simply availed himself of the flexibility generally extended to managers at the Timberwood Grill. Bergens Dep., R.32-6, PageID.1114. Bergens did occasionally arrive or leave 15 or 30 minutes after or before his scheduled shifts to accommodate his ongoing therapy. Bergens Dep., R.32-6, PageID.1114, 1121. But these sorts of scheduling accommodations were normal at the Timberwood Grill. Bergens Dep., R.32-6, PageID.1115–16. "[O]ther managers…always got concession[s] on their schedule[s] for doctors' appointments" or other family needs. Bergens Dep., R.32-6, PageID.1115–16. "It was never a big deal if somebody had to come in late or leave a little early." Bergens Dep., R.32-6, PageID.1116. Bergens also occasionally went home from work early if the restaurant wasn't busy. Bergens Dep., R.32-6, PageID.1118. This was also a standard practice: "Every manager left early whenever they got a chance." Bergens Dep., R.32-6, PageID.1118. When Perham would tell Bergens it was OK to leave early because the restaurant wasn't busy, Bergens "made it clear that [he] didn't need to" and remained "fine to work." Bergens Dep., R.32-6, PageID.1118.

17

**K.    After Bergens Returned to Work, Everything in the Employment Relationship Changed. His Coworkers Called Him Ableist Names. His General-Manager Training Dramatically Slowed. He Was Cut Out of Planning Discussions About the Blue Moose Alcoa. MacDonald and Delahunt Repeatedly Questioned Bergens's Fitness.**

Even though Bergens was able to do every part of his job after returning to work, his employment experience was soon fundamentally changed. All manner of evidence began to suggest that Diverse's decisionmakers no longer considered Bergens fit to lead the Blue Moose Alcoa as its general manager. His coworkers and supervisors repeatedly questioned whether Bergens was up to the job. They called him names, dubbing Bergens the "one arm bandit." Bergens's training for the general manager role slowed and in some areas ceased altogether. Bergens found himself cut out of conversations with MacDonald and Delahunt about the opening of the new restaurant. When they did speak to Bergens, MacDonald and Delahunt focused almost exclusively on their concerns about Bergens's condition and ability to do the job. MacDonald and Delahunt eventually hired another assistant manager and began grooming him to open the Blue Moose Alcoa.

**(1)    Bergens's colleagues and supervisor began making vague complaints about Bergens's performance.**

Shortly after Bergens returned to work, the other managers at the Timberwood Grill began making vague but negative remarks about Bergens's performance. Bergens Dep., R.32-6, PageID.1137. For example,

18

King, another assistant manager, complained to other managers that Bergens was not "carrying his weight." King Dep., R.32-1, PageID.485. Perham told another manager that Bergens was "worthless" the next day if he worked too hard on a long shift. Perham Text Messages, R.28, PageID.221.

Bergens's coworkers expressed related sentiments to Bergens—for example, telling Bergens, "you look like you're not feeling good," "you look like you're struggling," and "we don't want you to be tired tomorrow." Bergens Dep., R.32-6, PageID.1117–18. Bergens understood these paternalistic comments to "imply[] that [he] couldn't do" the job. Bergens Dep., R.32-6, PageID.1118.

None of these comments ever identified a specific problem with Bergens's performance. But they showed a shared and growing perception among the other managers at the Timberwood Grill that Bergens was somehow falling short on the job. Bergens Dep., R.32-6, PageID.1137; King Dep., R.32-1, PageID.485.

### (2)    Other managers started calling Bergens ableist names, including the "one arm bandit."

On top of these remarks, Bergens's coworkers started calling Bergens names. King and Perham (among others) began calling Bergens "old man" and the "one arm bandit." Bergens Dep., R.32-6, PageID.1116–17. The one-arm-bandit name became so ubiquitous around the

Timberwood Grill that "it kind of became…[Bergens's] nickname." Bergens Dep., R.32-6, PageID.1117-.

Bergens took a philosophical approach in the face of these comments. He understood that, on one level, his colleagues were "trying to be funny." Bergens Dep., R.32-6, PageID.1116. Bergens resolved "not [to] let it bother [him]." Bergens Dep., R.32-6, PageID.1116. But Bergens found the names "hurtful" and "[in]appropriate." Bergens Dep., R.32-6, PageID.1120. Worse, he understood the name calling to imply that he couldn't do his job. Bergens Dep., R.32-6, PageID.1116–17. Bergens responded by redoubling his efforts and trying to prove his naysayers wrong. As Bergens explained: "I just kept doing my job. I kept visiting tables. I kept running food. I kept working…with one hand because I knew that I needed to show that I could continue to do the job." Bergens Dep., R.32-6, PageID.1116–17. "[I]f anything, [Bergens] was working harder because" he felt he needed to prove himself in the face of such negative scrutiny. Bergens Dep., R.32-6, PageID.1117.

### (3)   Bergens's training largely ceased.

These weren't the only changes that followed Bergens's stroke. After he returned to work, Bergens's general-manager training also changed. Perham Dep., R.32-4, PageID.832. Some elements of Bergens's training, including the creation of financial reports, never resumed. Perham Dep., R.32-4, PageID.832. And recall that, before Bergens's stroke, plans were in place for Bergens to continue his training at the

20

Blue Moose Pigeon Forge. Bergens Dep., R.32-6, PageID.1108. But efforts to plan that training never materialized and the training never happened. Bergens Dep., R.32-6, PageID.1224. There's no mystery as to why: "Delahunt…express[ed]…concern about [Bergens's] ability to do the training." Bergens Dep., R.32-6, PageID.1224.

### (4) Bergens was excluded from discussions about opening the Blue Moose Alcoa.

Bergens's involvement in preparations for opening the Blue Moose Alcoa also shifted. Within a few weeks after his return to work, Bergens "could tell that things were starting to change." Bergens Dep., R.28, PageID.196. Where previously Bergens had been involved in conversations about the new restaurant, MacDonald and Delahunt began to exclude Bergens from those discussions. Bergens Dep., R.28, PageID.195; Bergens Dep., R.32-6, PageID.1132.

### (5) Bergens faced frequent questioning from MacDonald and Delahunt about his abilities.

Instead of discussing the new restaurant, MacDonald and Delahunt shifted their focus nearly exclusively to Bergens's perceived fitness. MacDonald and Delahunt discussed Bergens's condition multiple times a week. MacDonald Dep., R.32-5, PageID.955. And both Delahunt and MacDonald began peppering Bergens with questions about his condition: "[W]hat's your timeline on your rehab[?]" Bergens Dep., R.32-6, PageID.1130. "I don't think you're going to be able to train" new staff members. Bergens Dep., R.32-6, PageID.1130. "What's the progress on

21

your arm?" Bergens Dep., R.32-6, PageID.1130. "How do you think you're going to be able to do this?" Bergens Dep., R.32-6, PageID.1130. Delahunt and MacDonald even asked Bergens whether he "might be susceptible to having another stroke"—a point that "no doctor ever" expressed any concern over. Bergens Dep., R.32-6, PageID.1331. These sorts of questions and comments became incessant. MacDonald and Delahunt questioned Bergens about his fitness "[o]ver and over." Bergens Dep., R.32-6, PageID.1133.

With MacDonald and Delahunt asking Bergens "the same types of questions" again and again, Bergens "realize[d] this [wa]sn't concern for [his] health." Bergens Dep., R.32-6, PageID.1133. "This [wa]s [a] concern that they didn't think [he] could do the job." Bergens Dep., R.32-6, PageID.1133. It became "very obvious" to Bergens that Delahunt and MacDonald "didn't think that [Bergens] was going to be able to the open the Blue Moose restaurant." Bergens Dep., R.32-6, PageID.1140; Bergens Dep., R.32-6, PageID.1132.

Faced with a barrage of skeptical questions, Bergens tried to reassure MacDonald and Delahunt that he remained on track to make a full recovery and open the Blue Moose Alcoa as the restaurant's general manager. Bergens Dep., R.32-6, PageID.1201; MacDonald Dep., R.32-5, PageID.955. And above all else, Bergens kept working—"making sure…[he] was showing that [he] was capable of doing the job." Bergens Dep., R.32-6, PageID.1132.

22

**(6)** **Diverse made staffing decisions that were inconsistent with Bergens assuming the general manager role.**

Delahunt and MacDonald were unmoved by Bergens's assurances. They continued to make plans for opening the Blue Moose Alcoa—without Bergens at the helm. Three pieces of evidence support that conclusion.

First, Delahunt and MacDonald hired a new assistant general manager and began grooming him—instead of Bergens—to be the general manager at the Blue Moose Alcoa. In October 2022, Delahunt and MacDonald hired Jack Coppinger as an assistant manager at the Blue Moose Pigeon Forge. MacDonald Dep., R.32-5, PageID.966. Like Bergens, Coppinger had extensive experience as a general manager in the restaurant industry. Delahunt Dep., R.32-3, PageID.665. Delahunt and MacDonald hired Coppinger intending for Coppinger join the Blue Moose Alcoa when it opened. Delahunt Dep., R.32-3, PageID.667. They set Coppinger's annual bonus at .5 percent of his restaurant's annual earnings—double Diverse's baseline bonus for new assistant managers. Coppinger New Hire Form, R.32-5, PageID.1090; Delahunt Dep., R.28, PageID.295. Coppinger began training at the Blue Moose Pigeon Forge months before any other manager. Manpower Planning Calendar, R.28, PageID.420. Coppinger assumed the role of general manager when the Blue Moose Alcoa opened. MacDonald Dep., R.32-5, PageID.981. All of this—Coppinger's experience, training, compensation, and eventual

23

promotion—shows that Delahunt and MacDonald hired Coppinger to be the general manager at the Blue Moose Alcoa before they fired Bergens.

Second, Delahunt and MacDonald disregarded Bergens's recommendations for staffing the Blue Moose Alcoa. After Bergens was formally offered the general manager position, he started thinking about shaping his team of assistant managers. Bergens Dep., R.32-6, PageID.1151. With that goal in mind, Bergens recommended that Mandy Benton, an assistant manager working at another restaurant run by Diverse, be transferred to the Blue Moose Alcoa to work under Bergens. Bergens Dep., R.32-6, PageID.1151. MacDonald initially responded positively. He told Bergens after "look[ing] into it" that "[w]e are a semi go on that." MacDonald Text Messages, R.28, PageID.257. Little more than a week later, though—and just days after hiring Coppinger— Delahunt suddenly reversed course, refusing to transfer Benton. Delahunt Email, R.32-5, PageID.1091. Marty Armbrester, Diverse's Director of Human Resources, caught on that something unusual was afoot. Responding to the news about the abrupt change of plans, he wrote: "Interesting." Delahunt Email, R.32-5, PageID.1091. The upshot of this back-and-forth is clear enough: because Delahunt and MacDonald were no longer interested in Bergens leading the Blue Moose Alcoa, they no longer had any reason to consider Bergens's staffing recommendations.

Third, neither Delahunt nor MacDonald (or anyone else) ever broached the topic of whether Bergens would need any accommodations

24

once he left the Timberwood Grill. Although Bergens had spoken to his supervisors about accommodations at the Timberwood Grill, none of them ever talked to Bergens about accommodations for his training at the Blue Moose Pigeon Forge or later at the Blue Moose Alcoa. Bergens Dep., R.32-6, PageID.1218–19. The implication from this absence is equally clear: Delahunt and MacDonald decided that Bergens was "not going to be able to" continue his training or lead the Blue Moose Alcoa, so no discussion about accommodations was needed. Bergens Dep., R.32-6, PageID.1218.

### L.    The Moonshine Incident.

On October 18, 2022, Bergens was working the mid shift at the Timberwood Grill. King Statement, R.28, PageID.315. King and Biddle arrived around 3 p.m. to begin working the closing shift. King Statement, R.28, PageID.315. Bergens planned to eat dinner at the Timberwood Grill after work with his wife and aunt, then leave on a family vacation. Bergens Dep., R.32-6, PageID.1165, 1173.

After King arrived, Bergens asked King to pick up two bottles of moonshine for him at Ole Smoky Moonshine Distillery. King Dep., R.32-1, PageID.491. This was not an unusual request. Ole Smoky Moonshine Distillery is right across the plaza from the Timberwood Grill within the Island. Bergens Dep., R.32-6, PageID.1230. King often picked up bottles of moonshine from employees he knew at Ole Smoky, then gave them away to "[e]verybody" at the Timberwood Grill, including Perham,

25

Bergens, and other managers. King Dep., R.32-1, PageID.475; Bergens Dep., R.32-6, PageID.1154; Perham Dep., R.32-4, PageID.788.

King agreed to Bergens's request and picked up two jars of moonshine for Bergens and a third jar for himself. Bergens Dep., R.32-6, PageID.1156; King Dep., R.32-1, PageID.492.

When King returned with the moonshine, though, he decided to "pull[] a joke" on Bergens. King Dep., R.32-1, PageID.492. This was also not unusual. There were "a lot of jokes and horseplay" among the staff at the Timberwood Grill. King Dep., R.32-1, PageID.479. And King in particular was known as "a prankster and a joker." Bergens Dep., R.32-6, PageID.1206.

To pull off his prank, King first went to the manager's office and hid Bergens's two jars of moonshine up on a shelf. King Dep., R.32-1, PageID.508–09. He left the third jar in his own backpack, which was hanging next to Biddle's purse on the back of the office door. Bergens Dep., R.32-6, PageID.1163. King and Bergens then crossed paths in the dining room. Bergens Dep., R.32-6, PageID.1158. King told Bergens that he wasn't going to give Bergens the jars of moonshine after all. King Dep., R.32-1, PageID.492–93; Bergens Dep., R.32-6, PageID.1160. King said he was instead "keeping one" and had "g[iven] the other" to Biddle. King Dep., R.32-1, PageID.493; Bergens Dep., R.32-6, PageID.1160. King told Bergens that he had "put [a jar of moonshine] in [Biddle's] purse" because

26

"she wanted it more than" Bergens did. Bergens Dep., R.32-6, PageID.1159.

To make this point very clear: all of this was meant as a joke. King testified nine times that he was "pulling a joke" on Bergens. King Dep., R.32-1, PageID.492–93, 497, 499, 506–07, 510, 526. King hadn't really given away the jars of moonshine he'd retrieved for Bergens. King Dep., R.32-1, PageID.492–93, 497, 499, 506–07, 510, 526. King instead was "hiding" Bergens's jars of moonshine, hoping to send Bergens on a "wild goose chase" to hunt them down. King Dep., R.32-1, PageID.508; Bergens Dep., R.32-6, PageID.1127, 1183. King's demeanor and tone made the joke abundantly clear to Bergens. King Dep., R.32-1, PageID.493; Bergens Dep., R.32-6, PageID.1128, 1183.

Bergens and King both responded based on their shared understanding of King's prank. Bergens walked back to the manager's office to hunt for the moonshine, thinking King had "sen[t] [him] back there looking" for it. Bergens Dep., R.32-6, PageID.1160. At the same time, King walked to the kitchen to watch the restaurant's security camera feed. Bergens Dep., R.32-6, PageID.1183; King Dep., R.32-1, PageID.496–97. That video feed showed live footage of the manager's office, and King wanted to watch his practical joke play out in real time. Bergens Dep., R.32-6, PageID.1183; King Dep., R.32-1, PageID.496–97.

27

What happened next was partially recorded on video, a copy of which is in the record and embedded below at page 30.[1] Once in the office, Bergens saw that Biddle's purse was already open, hanging on the back of the office door. Video at 0:14; Bergens Dep. R.32-6, PageID.1163. Bergens pulled the front flap of the purse toward him with the tip of one finger to look inside. Video at 0:14-16; Bergens Dep., R.32-6, PageID.1163. In less than two seconds, it became clear to Bergens that the purse could not be holding a 750-milliliter jar of moonshine, so he let it go. Video at 0:16; Bergens Dep., R.32-6, PageID.1163; King Dep., R.32-1, PageID.501. Bergens never reached into Biddle's purse. Bergens Dep. R.32-6, PageID.1163; Video at 0:16.

Bergens then ran his hand along the outside of King's backpack and felt something heavy—consistent with one or more jars of moonshine. Bergens Dep., R.32-6, PageID.1163; Video at 0:18. Before looking inside King's bag, though, Bergens searched the rest of the office just in case, but didn't find anything. Video at 0:22–42. Right as Bergens returned to King's bag, Biddle walked into the office. Video at 0:43. Bergens made no

---

[1] The original security camera footage was not retained by Diverse. MacDonald Dep., R.32-5, PageID.997; Delahunt Dep., R.43-3, PageID.1643. As explained below, the copy of the video that is in the record was captured by Perham, who filmed a one-minute portion of the original video before the original was destroyed. Perham's "video of a video" fails to capture any of the original sound, and it cuts off before King joins Bergens in the manager's office at the end of the prank. Nevertheless, the video in the record is still powerful evidence corroborating Bergens's account in this case.

attempt to hide what he was doing from Biddle. Video at 0:46–51. Bergens then unzipped King's backpack and looked inside. Video at 0:46–51. He reached in to confirm that the backpack held the moonshine. Video at 0:56–59. Feeling that it did, Bergens then zipped the backpack back up without removing anything. Bergens Dep., R.32-6, PageID.1163; Video at 1:00.

Apparently having had his fun, King joined Bergens in the manager's office. King Dep., R.32-1, PageID.498. King was "laughing" about how he'd just watched Bergens on video fumble around looking for the jars. Bergens Dep., R.32-6, PageID.1127-28. Bergens was laughing too. Bergens Dep., R.32-6, PageID.1127. King grabbed both jars of moonshine down from the shelf and handed them to Bergens. King Dep., R.32-1, PageID.498. With King's practical joke at an end, Bergens and King bantered a bit longer in the office. King told Bergens about the flavors of moonshine he had picked out and his favorite mixed-drink recipes involving moonshine. Bergens Dep., R.32-6, PageID.1127. Bergens's conversation with King remained lighthearted and friendly. Bergens Dep., R.32-6, PageID.1127. King never expressed any negative reaction about Bergens's search for the moonshine, nor did he give Bergens any other indication that anything was amiss. Bergens Dep., R.32-6, PageID.1127.

### M.    Word of King's Prank Traveled Up the Chain.

Like a game of telephone, word of King's prank—and Bergens's role in it—traveled up the chain.

After King's joke ended, Bergens's shift wrapped up without incident. Bergens Dep., R.32-6, PageID.1165, 1173. Bergens had dinner at the Timberwood Grill with his family, then left for a family vacation as planned. Bergens Dep., R.32-6, PageID.1165, 1173.

Around 11 p.m., as the restaurant was closing, King told Biddle about the moonshine prank. King Statement, R.28, PageID.317. The next day, King and Biddle told Perham. King Statement, R.28, PageID.317. King, Biddle, and Perham viewed the security video of Bergens looking for the moonshine. Perham filmed a snippet of the video on her phone, in which King can be heard laughing and commenting in the background. This video is embedded and viewable here:



30

King told Perham that he had been playing a prank on Bergens, jokingly telling Bergens that he "gave [the moonshine] to Ms. Biddle." Perham Dep., R.32-4, PageID.840. Perham, however, claimed that both King and Biddle were "very upset that their bags were rummaged through." Perham Dep., R.32-4, PageID.840. She told them that she would pass on the information to MacDonald and Delahunt. Perham Dep., R.32-4, PageID.841.

Perham sent MacDonald her phone video and called him, telling MacDonald that Bergens "was on a video going through [King and Biddle's] bags." MacDonald Dep., R.32-5, PageID.987–88.

Instead of following up with anyone who was present at the Timberwood Grill on October 18, MacDonald immediately called Delahunt. MacDonald Dep., R.32-5, PageID.988. MacDonald forwarded the video to Delahunt and repeated the "[s]ame thing that [Perham] had said" to him, including that Bergens "was looking for moonshine that…King got for him." MacDonald Dep., R.32-5, PageID.988; Delahunt Dep., R.32-3, PageID.634.

### N.  MacDonald and Delahunt Conducted No Investigation.

After watching Perham's video clip, MacDonald and Delahunt "decided to fire" Bergens. Delahunt Dep., R.32-3, PageID.636. They did so without (1) watching the full security video, Delahunt Dep., R.43-3, PageID.1643, (2) speaking with King, Biddle, or Bergens, Delahunt Dep., R.43-3, PageID.1644, or (3) following Diverse's progressive-discipline

31

policy, which requires "verbal counseling, a written warning, a potential suspension, and then termination." Armbrester Dep., R.32-2, PageID.603; Delahunt Dep., R.32-3, PageID.633–34. Indeed, Diverse's progressive-discipline policy states that "every attempt will be made to advise employees of improper conduct…by way of counseling, progress reviews, coaching and documentation in an effort to avoid discharge or dismissal, if possible." Employee Handbook, R.39-1, PageID.1488. Delahunt said Diverse "typically" follows this "progressive discipline" policy, which is "aimed toward correcting the action" at issue before taking further measures. Delahunt Dep., R.32-3, PageID.643.

## O.   MacDonald and Delahunt Fired Bergens.

MacDonald and Delahunt called Bergens. Bergens Dep., R.32-6, PageID.1173. Bergens was driving with his family into the mountains. Bergens Dep., R.32-6, PageID.1173. He pulled over and got out of the car to take the call. Bergens Dep., R.32-6, PageID.1173–74.

Bergens immediately heard accusations "like [he] was stealing stuff." Bergens Dep., R.32-6, PageID.1174. Bergens told Delahunt and MacDonald that he "didn't steal anything." Bergens Dep., R.32-6, PageID.1174. Delahunt demanded to know if he was "going through people's bags at work." MacDonald Dep., R.32-5, PageID.978. Bergens repeated that he "didn't steal anything." Bergens Dep., R.32-6, PageID.1174; Delahunt Dep., R.32-3, PageID.636. Delahunt then began to describe the details of Perham's video clip of Bergens's search for the

32

moonshine. Delahunt Dep., R.32-3, PageID.636; MacDonald Dep., R.32-5, PageID.977. Only then did Bergens "eventually…realize[]" that Delahunt and MacDonald were talking about the moonshine prank. Bergens Dep., R.32-6, PageID.1174. Bergens "immediately started explaining what had happened," feeling "relieved" and confident that any misunderstanding "should be very easily cleared up." Bergens Dep., R.32-6, PageID.1174.

But MacDonald and Delahunt had already made up their minds. Delahunt Dep., R.32-3, PageID.636. Delahunt claimed that the video standing alone showed such a "clear lack of judgment and a lack of character that [he couldn't] have [Bergens] working in any restaurant." Delahunt Dep., R.32-3, PageID.634. They fired Bergens at the end of the call. Bergens Dep., R.32-6, PageID.1174.

## P.  Employees Engaging in Similar Conduct Were Treated Far Less Harshly Than Bergens.

Delahunt and MacDonald's decision to throw the book at Bergens seems even more extreme when compared to other cases of alleged misconduct. Other employees who were accused of misconduct were routinely given little or no discipline at all—let alone fired. And with Bergens as the lone exception, Diverse consistently investigated claims of wrongdoing and followed the company's progressive-discipline policy. Delahunt Dep., R.32-3, PageID.643.

33

One relevant comparator, an employee at the Timberwood Grill who opened King's backpack without permission and filled it with used bottle caps, was given no discipline at all. Robert Cartree, the bar manager at the Timberwood Grill during Bergens's tenure, played a practical joke on King by going into the manager's office and dumping a large container of "old sticky bottle caps" into King's backpack. Bergens Dep., R.32-6, PageID.1167; King Dep., R.32-1, PageID.479. When King visited the office that evening, he noticed his bag was "heavier than normal." King Dep., R.32-1, PageID.479. When he unzipped it, he found the bag filled with bottle caps. King Dep., R.32-1, PageID.479–80. King interpreted this as a "joke", part of the frequent "jokes and horseplay that [went] on at the restaurant." King Dep., R.32-1, PageID.479. Cartree and Perham were with him in the office, and they "laugh[ed] about it" too. Bergens Dep., R.32-6, PageID.1226. Cartree was never disciplined in any way for this "joke." Defendants' Response to Plaintiff's Statement of Disputed Material Facts, R.40, PageID.1585.

King himself provides another telling point of comparison. King was repeatedly accused of sexist behavior and sexual harassment but never faced any discipline.

King received "counsel[ing] on multiple different occasions by…Perham[] and…MacDonald" because of "issues with [his] performance and immature conduct." King Dep., R.32-1, PageID.476; Perham Dep., R.32-4, PageID.791, 794. A server at the Timberwood Grill

34

complained about King's "sexist" behavior. King Dep., R.32-1, PageID.471. Following that accusation, members of Diverse's human-resources team visited the restaurant and interviewed those involved. King Dep., R.32-1, PageID.471. King ultimately faced no discipline stemming from the complaint. King Dep., R.32-1, PageID.472.

Later, King and another manager arranged "a potato and some other vegetables," Perham Dep., R.32-4, PageID.794, to resemble a "penis and testicles," adding "sour cream like it was ejaculating." King Dep., R.32-1, PageID.794; Bergens Dep., R.32-6, PageID.1129, 1168. King then presented his creation to the servers working under him, "sexually harassing employees by telling them it was their lunch." Bergens Dep., R.32-6, PageID.1168. Diverse's workplace harassment policy specifically prohibits "[t]he display of sexually suggestive pictures or objects in any workplace location." Employee Handbook, R.39-1, PageID.1489. MacDonald "spoke to…King about" the harassment, but once again did not "write him up" for his behavior. MacDonald Dep., R.32-5, PageID.994.

This list goes on. Perham described Amber Ogle, another assistant manager at the Timberwood Grill, as a "compulsive liar" who "caus[ed] an extreme amount of conflict…with the staff and the managers." Perham Dep., R.32-4, PageID.776. Yet Ogle was not immediately fired for this behavior. Instead Perham followed the progressive-discipline policy, beginning with verbal counseling consisting of "many

35

conversations" with Ogle about her behavior. Perham Dep., R.32-4, PageID.776.

Yet another Timberwood Grill employee was caught on multiple occasions with "alcohol in a kids cup…drinking on the job" to the point of intoxication. Bergens Dep., R.32-6, PageID.1169. Yet Diverse "didn't do anything about it" until his third offense. Bergens Dep., R.32-6, PageID.1169.

Another manager at a nearby restaurant "took a video inside the kitchen" of himself and other employees "spitting and cursing." Bergens Dep., R.32-6, PageID.1170. He then posted the video to social media, announcing that he and the other employees worked for Diverse. Bergens Dep., R.32-6, PageID.1170. He wasn't fired either. Bergens Dep., R.32-6, PageID.1170.

Jack Coppinger, the general manager Delahunt hired to replace Bergens and lead the Blue Moose Alcoa, supplies the final point of comparison. While Coppinger was in training at the Blue Moose Pigeon Forge, he had a sexual relationship with a server at the restaurant—one of Coppinger's subordinates—and got her pregnant. MacDonald Dep., R.32-5, PageID.983–84; Delahunt Dep., R.32-3, PageID.676–77. This is another clear violation of Diverse's policies, which provides that "managers are prohibited from dating subordinates and may be disciplined for such actions, up to and including termination." Employee Handbook, R.39-1, PageID.1491; Delahunt Dep., R.32-3, PageID.680;

36

Armbrester Dep., R.32-2, PageID.616. Instead of being fired, though, Coppinger was promoted to general manager at the Blue Moose Alcoa shortly after the relationship was uncovered. Armbrester Dep., R.32-2, PageID.617; MacDonald Dep., R.32-5, PageID.984–85.

While serving as general manager, Coppinger continued to engage in "immature" conduct, discussing "drugs," "drinking," "partying," and "his exploits with ladies" with his subordinates. MacDonald Dep., R.32-5, PageID.983. Again, Coppinger was not fired, but merely received verbal warnings. Delahunt Dep., R.32-3, PageID.670–71. Eventually, Coppinger was asked to accept a demotion to assistant manager at Timberwood Grill—the same position Bergens held before he was fired. Delahunt Dep., R.32-3, PageID.668–69.

## II.   PROCEDURAL BACKGROUND.

Bergens filed suit after exhausting his administrative remedies. Complaint, R.1, PageID.1; EEOC Charge, R.1-1, PageID.21. He claimed that Diverse discriminated and retaliated against him on the basis of disability under the Americans with Disabilities Act and Tennessee anti-discrimination law. Complaint, R.1, PageID.18.

Following discovery, Diverse moved for summary judgment, arguing that Diverse "did not discriminate…or unlawfully retaliate against" Bergens on the basis of his disability. Def. Mem., R.27, PageID.153.

37

The district court applied the familiar three-step *McDonnell Douglas* test. First, it held that Bergens established all elements of his prima facie case of employment discrimination. Opinion, R.61, PageID.1771–72. The district court held that Bergens had demonstrated that he (1) "ha[d] a disability," namely the ongoing effects of his stroke, (2) "[wa]s otherwise qualified for the position" he held, and (3) "suffered an adverse employment decision" when Diverse fired him. The court also concluded that Bergens had proven that Diverse (4) knew of his disability and (5) replaced him with someone without his disability. Opinion, R.61, PageID.1771–72 (quoting *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017)).

Second, the district court held that Diverse's claimed reason for firing Bergens—because he "rifled through his co-workers' personal belongings without permission"—was "a legitimate, nondiscriminatory reason to terminate" him. Opinion, R.61, PageID.1772 (quoting Def. Mem., R.27, PageID.166).

Third, the district court held that Bergens had failed to meet his burden to show pretext. Opinion, R.61, PageID.1772. The court treated each piece of circumstantial evidence Bergens presented in isolation: Either it proved pretext, or it didn't count at all. This led the court to dismiss (1) the evidence that King had "played a prank on" Bergens as "immaterial," (2) the proof that King and Perham referred to Bergens as the "one arm bandit" as "irrelevant," and (3) the bulk of Bergens's

38

comparator evidence as unpersuasive for failing to present "substantially identical conduct," Opinion, R.61, PageID.1772, 1774. In doing so, the court ignored the contribution these and other facts provided to the larger portrait of discrimination.

The district court repeatedly drew inferences in Diverse's favor to conclude that "no reasonable juror could find that [Bergens's behavior] was insufficient to warrant termination" or that MacDonald and Delahunt "terminated [Bergens] because they did not want him in the general manager position." Opinion, R.61, PageID.1773. Based on this flawed analysis, the district court granted Diverse's motion for summary judgment. Judgment, PageID.1779.

Bergens appealed. Notice of Appeal, R.64, PageID.1789.

## SUMMARY OF THE ARGUMENT

This case cannot be decided as a matter of law at summary judgment. With the evidence construed in Bergens's favor, a jury could find that Diverse fired Bergens because of his disability.

Diverse does not dispute that Bergens established a prima facie case of disability discrimination at the first step of the *McDonnell Douglas* burden-shifting analysis. At the second step, Diverse instead proffered an alternate justification for terminating Bergens. But, at the third step, Bergens produced evidence sufficient to show that Diverse's justification was pretextual and that he was fired because of his disability. That's true for three closely related reasons.

39

First, Diverse's justification for firing Bergens was so caricatured as to have no basis in fact. Diverse exaggerated Bergens's culpability in the moonshine prank and wove an implausible tale of broken trust that is contradicted by the record.

Second, the Diverse's decisionmakers signaled that they had already planned to fire Bergens, which shows that Bergens's disability remained a but-for cause of his firing. They formed this plan within an atmosphere of discrimination and hostility toward Bergens's disability. After suffering a stroke, Bergens found himself cut out of conversations about opening the new restaurant. The company hired Bergens's replacement and reversed course on Bergens's hiring recommendation. Considered in light of the temporal proximity between Bergens's stroke and his termination, this evidence would allow a jury to reject Diverse's justification as the sole moving force behind Bergens's firing and infer that Bergens's disability motivated Diverse to terminate him.

Third, the moonshine incident was insufficient in the context of Diverse's workplace to explain firing Bergens. Bergens was the victim of a workplace prank. Yet MacDonald and Delahunt decided to fire Bergens without talking to anyone involved in the incident or following Diverse's progressive-discipline policies. This sort of behavior—rushing to turn molehills into mountains—is a classic hallmark of pretext. On top of that, comparator evidence shows that similar—and often far worse— misconduct routinely went unpunished when committed by employees

40

who were not disabled. Diverse fired Bergens in an abrupt departure from its usual disciplinary procedures. A jury could reasonably conclude that Diverse treated Bergens differently because of his disability.

The district court's judgment should be reversed.

## STANDARD OF REVIEW

Grants of summary judgment are reviewed de novo, "view[ing] all evidence in the light most favorable to the nonmoving party." *C.S. v. McCrumb*, 135 F.4th 1056, 1060 (6th Cir. 2025). At this stage, "credibility judgments and weighing of the evidence are prohibited." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). Thus, this Court "may uphold the district court's grant of summary judgment against [Bergens] only if the record shows that [Diverse] established [its] defense so clearly that no rational jury could have found to the contrary." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021) (cleaned up).

"[C]ourts should be cautious in…affirming[] summary judgment on discrimination claims…because an employer's true motivations are particularly difficult to ascertain…making such factual determinations unsuitable for disposition at the summary judgment stage." *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 810 (6th Cir. 2020) (cleaned up).

41

## ARGUMENT

### I.    A REASONABLE JURY COULD FIND THAT DIVERSE FIRED BERGENS BECAUSE OF HIS DISABILITY.

The district court erred in granting summary judgment for Diverse. The only question presented on appeal is causation: whether a reasonable jury could find that Diverse fired Bergens, in whole or in part, because of concerns about his ability to do the job following his stroke. The answer to that question is yes. The record clearly establishes that Diverse's decisionmakers lost faith in Bergens after his stroke. The record just as clearly shows that Diverse's claimed justification for firing Bergens was pretextual.

### A.    The ADA Prohibits Discrimination Because of a Disability.

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).

An employer discriminates on the basis of disability when it would not have taken an adverse action "but-for" an employee's disability. *Lewis*, 681 F.3d at 315, 318.

Two important points illuminate the ADA's causation standard.[2] First, establishing but-for causation "does not require the employee to show that the disability was the 'sole' cause of the adverse employment

---

[2] The district court dismissed Bergens's state-law claims without independent analysis, stating that they "are analyzed under the same principles as the ADA claims." Opinion, R.61, PageID.1771. If this Court reverses summary judgment on Bergen's ADA claims, it therefore must also reverse as to Bergens's state-law claims.

action." *Id.* at 316. Because many "events have multiple but-for causes, [an employer]…cannot avoid liability just by citing some other factor that contributed to its challenged employment decision." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020). "So long as [disability] was one but-for cause of that decision, that is enough to trigger the law." *Id.* The Supreme Court illustrated this principle using a simple example: "Consider an employer with a policy of firing any woman he discovers to be a Yankees fan." *Id.* at 661. "Carrying out that rule because an employee is a woman and a fan of the Yankees is a firing 'because of sex' if the employer would have tolerated the same allegiance in a male employee." *Id.*

Second, refusing to employ someone out of concern that their disability might affect job performance is treating them "on the basis of disability." An employer, for example, is motivated by disability when it refuses to hire a person with narcolepsy out of fear that he'll fall asleep on the job, *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998); fires an employee with congestive heart failure out of concern that he'll be a "liability" at work, *Demyanovich v. Cadon Plating & Coating, LLC*, 747 F.3d 419, 424 (6th Cir. 2014); declines to hire a deaf applicant because of concern that he won't be able to "effectively communicate" with other employees, *Keith v. Cnty. of Oakland*, 703 F.3d 918, 921 (6th Cir. 2013); or refuses to hire an HIV-positive worker because of concern

43

that he was "not strong enough to withstand the rigors" of the work. *Holiday v. City of Chattanooga*, 206 F.3d 637, 641 (6th Cir. 2000).

With these principles in view, causation under the ADA tends to fit into one of two well-worn categories. In the first category of cases, the "employer acknowledges that it relied upon the plaintiff's handicap in making its employment decision." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 892 (6th Cir. 2016) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1182 (6th Cir. 1996)). In these cases, "the employer's intent…has been admitted…and the plaintiff has direct evidence of discrimination on the basis of his or her disability." *Id.*

In the second category of cases—this case among them—the employer offers a reason for taking an adverse action that is unrelated to the plaintiff's disability. These cases are analyzed under "the familiar *McDonnell Douglas* burden shifting framework." *Bennett v. Hurley Medical Ctr.*, 86 F.4th 314, 325 (6th Cir. 2023) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). First, the plaintiff must make out "a prima facie case of intentional discrimination." *Id.* Second, "the burden shifts to the defendant to proffer 'a legitimate, nondiscriminatory reason for its actions.'" *Id.* (cleaned up) (quoting *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 683 (6th Cir. 2016)). Third, "the burden shifts back to the plaintiff to show that the 'proffered reason is merely a pretext for unlawful discrimination.'" *Id.* (quoting *Gohl*, 836 F.3d at 683).

44

This case turns on the third step—establishing pretext—so a word about pretext is in order. At its core, pretext "is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). A plaintiff may show pretext in "three interrelated ways": by demonstrating "'(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [his discharge], or (3) that they were insufficient to motivate [discharge]." *Chen*, 580 F.3d at 400.

In assessing pretext, courts must remain mindful of the interplay between *McDonnell Douglas*'s pretext inquiry and *Bostock*'s but-for causation rule. As *Bostock* explained, legitimate and illegitimate motives can exist side by side. *Bostock*, 590 U.S. at 661. A successful plaintiff therefore need not wholly discredit his employer's justification. *Id.* He must instead identify "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's justification that are sufficient to "cast[] doubt on the employer's proffered reason as the *only reason* for its action." *Berry*, 84 F.4th at 1308 (emphasis added).

At day's end, this Court must remember that the *McDonnell Douglas* framework was "never intended to be rigid, mechanized, or ritualistic." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983). "Rather, it is merely a sensible, orderly way to evaluate the

45

evidence in light of common experience as it bears on the critical question of discrimination." *Id.* "The sole question that matters in employment discrimination cases is whether a reasonable juror could conclude that the plaintiff would have kept his job if he was not in the protected class, and everything else had remained the same." *Hannon v. Louisiana-Pacific Corp.*, 784 F. App'x 444, 448 (6th Cir. 2019) (quoting *Ortiz v. Werner Enterps., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016)).

**B.   Diverse's Stated Reason for Firing Bergens Was Pretextual: It Fired Him Because of His Disability.**

Applying these principles here is straightforward. Imagine a world where Bergens never suffered a stroke but everything else remained the same. Would his employer have summarily fired him, with no investigation, following the moonshine prank? A reasonable jury could easily conclude not, for three closely related reasons: Diverse's claims that Bergens broke their trust by rifling through his coworkers' bags have no basis in fact. Diverse had ulterior, discriminatory motives for firing Bergens. And Diverse did not fire other employees for similar—and much worse—behavior.

**(1)   Diverse's proffered justification has no basis in fact.**

Diverse's supposed justification for firing Bergens—that he rifled through coworkers' bags without permission such that his coworkers' trust in him was broken—had no basis in fact. *Chen*, 580 F.3d at 400. Bergens produced more than enough evidence to show that he never

46

handled coworkers' bags in the way that Diverse claims and that his coworkers never lost trust in him.

A jury could reasonably reject Diverse's description of Bergens's conduct during the moonshine prank.

Start with the video. The surveillance footage shows Bergens briefly touching and peering into Biddle's already open bag, but not "digging" or "rummaging through" it—contrary to Diverse's exaggerated characterization. Video at 0:14–16; Perham Dep., R.32-4, PageID.834; MacDonald Dep., R.28, PageID.333.

Delahunt's assumed that Bergens was "maybe attempting to steal." Delahunt Dep., R.28, PageID.281. But far from trying to steal from King, Bergens was in fact the unwitting target of a "joke" orchestrated by King himself. King Dep., R.32-1, PageID.492.

The daylight between Diverse's exaggerated depiction and the actual record evidence shows pretext.

A jury could also reject the other half of Diverse's justification—its narrative of broken trust. Bergens never betrayed his employer's trust; he was the target of a coworker's prank. When Delahunt and MacDonald called Bergens, he "immediately started explaining what had happened." Bergens Dep., R.32-6, PageID.1174. A reasonable jury could find Diverse's claim of broken trust entirely contrived.

47

### (2) Diverse fired Bergens because of his disability, not solely the moonshine prank.

But more than that, a jury could easily conclude that the moonshine prank was not Diverse's sole motivation for terminating Bergens. *Chen*, 580 F.3d at 400. It could instead find that the moonshine incident served as a convenient fig leaf for discrimination. Consider the evidence: Bergens's termination followed closely on the heels of his stroke. Throughout his recovery, Bergens's coworkers and supervisors grew increasingly hostile and discriminatory. Bergens Dep., R.32-6, PageID.1116. And Diverse had already decided to replace Bergens even before King's prank.

### (a) *The close temporal proximity between Bergens's stroke and his termination shows pretext.*

After his stroke, Bergens—previously Diverse's golden goose—quickly became an outcast. Diverse's sudden decision to fire Bergens suggests that his disability motivated his termination.

Delahunt and MacDonald formally offered Bergens a promotion to general manager. MacDonald Dep., R.32-5, PageID.935. To get to that point, Bergens had proven himself time and again to be a hard worker, Perham Dep., R.32-4, PageID.772–74; a charismatic leader, MacDonald Dep., R.32-5, PageID.934; and an overall "asset" to Diverse. MacDonald Dep., R.32-5, PageID.934. Delahunt had been looking for a general manager who embodied "[e]xperience, leadership, [and] integrity," and

48

he clearly found such virtues in Bergens. Delahunt Dep., R.32-3, PageID.647.

But then Bergens suffered a stroke, and within two months MacDonald and Delahunt were ready to fire him based on a workplace prank played on Bergens before even hearing his side of the story. Delahunt Dep., R.32-3, PageID.636. "[S]uspicious timing" like this "is a strong indicator of pretext when accompanied by some other, independent evidence." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012).

### (b)    *The hostile atmosphere at Diverse shows both pretext and discrimination.*

Timberwood employees, including Bergens's supervisors, were increasingly hostile and discriminatory towards Bergens as his stroke recovery wore on. This behavior is strong independent evidence that the moonshine prank was not the sole motivation for Bergens's termination.

Delahunt, MacDonald, Perham, and the other managers peppered Bergens with paternalistic questions about his ability to perform on the job after his stroke. Bergens Dep., R.32-6, PageID.1117–19. These included unfounded prognostications about Bergens's susceptibility to further medical complications, even though no doctor had ever suggested as much. Bergens Dep., R.32-6, PageID.1131. At every turn, Diverse framed Bergens's workplace conduct through the lens of his disability. A

49

jury could infer that the same discriminatory scrutiny motivated his firing.

Bergens's co-workers also harassed him with discriminatory name-calling. King and other managers started calling Bergens the "one arm bandit." Bergens Dep., R.32-6, PageID.1116. King complained that Bergens was not "carrying his weight." King Dep., R.32-1, PageID.485–86. And Perham said that Bergens was "worthless" the next day if he worked too hard on a long shift. Perham Text Messages, R.32-4, PageID.922.

The district court improperly discounted these remarks as "irrelevant" based on its conclusion that "a statement by an intermediate level management official is not indicative of discrimination when the ultimate decision to discharge is made by an upper level official." Opinion, R.61, PageID.1774 (citing *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir. 1990)). But this Court has since retreated from that hard-line position, more recently holding that that "discriminatory remarks, even by a nondecision maker, can serve as probative evidence of pretext." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009). Just so here: "[A] discriminatory atmosphere…may serve as circumstantial evidence of individualized discrimination." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998).

50

### (c)    Diverse's proffered justification was not its sole motivation because the intention to oust Bergens formed before the moonshine prank.

The record also contains compelling evidence that Delahunt and MacDonald had decided to oust Bergens before the moonshine prank. Before October 18, 2022, Delahunt and MacDonald repeatedly signaled their intention to cut Bergens out, including by (1) excluding Bergens from the planning process for the opening of the Blue Moose Alcoa; (2) preparing for the opening without plans to make the accommodations necessary for Bergens's disability; (3) hiring Jack Coppinger to replace Bergens; and (4) refusing to bring on Mandy Benton, whom Bergens had recommended to be his assistant manager, after initially accepting Bergens's recommendation. By the day of the prank, MacDonald and Delahunt had already substantially eroded Bergens's ties to the general manager position at the Blue Moose Alcoa. When, as here, an "employer…waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up [its] true, longstanding motivations for firing the employee, the employer's actions constitute the very definition of pretext." *Hamilton*, 556 F.3d at 436.

First, Delahunt and MacDonald stopped including Bergens in preparations for opening the Blue Moose Alcoa after his stroke. Bergens testified that "[b]efore the stroke, [he] would always sit down with" Delahunt when he came to the Timberwood Grill to discuss plans for the Alcoa. Bergens Dep., R.32-6, PageID.1141. But after the stroke, Delahunt

51

"would be off on the side talking with [Perham]," and Delahunt's demeanor "was different" because he was "very concerned that [Bergens] wasn't capable." Bergens Dep., R.32-6, PageID.1141–42. Delahunt's exclusion of Bergens suggests pretext.

Second, despite his intense scrutiny of Bergens's performance as assistant manager, Delahunt never discussed the accommodations that Bergens would need as a general manager at the Alcoa. Bergens Dep., R.32-6, PageID.1219. A jury could reasonably infer from this lack of communication and planning that Delahunt did not intend to follow through in promoting Bergens.

Third, the record supports the inference that Diverse hired Coppinger specifically to replace Bergens. The two managers had remarkable similarities. Both were brought on as assistant managers despite extensive experience with—and a shared ambition for—general manager roles. Delahunt Dep., R.32-6, PageID.665. From the start, Diverse planned for both men to open the Blue Moose Alcoa as part of its managerial staff. Bergens Dep., R.32-6, PageID.1106; Delahunt Dep., 32-3, PageID.667; Alcoa Training Calendar, R.32-5, PageID.1093. A jury could conclude that Diverse, by hiring Coppinger, already intended to replace Bergens before the prank even occurred.

Fourth, and finally, days after hiring Coppinger, Delahunt also decided not to bring on Mandy Benton, Bergens's former coworker, to help open the Blue Moose Alcoa under Bergens. Bergens had

52

recommended Benton be transferred to the Alcoa as an assistant manager. Bergens Text Messages, R.28, PageID.257. MacDonald told Bergens that they were a "semi go" on transferring Benton. Bergens Text Messages, R.28, PageID.257. Then, after hiring Coppinger, Delahunt decided that Benton would be "staying put." Delahunt Emails, R.32-5, PageID.1091. The well-supported, reasonable inference: Delahunt decided not to transfer Benton because he no longer planned for Bergens to open the Blue Moose Alcoa.

Bergens has produced more than enough evidence for a jury to reject Diverse's proffered justification and conclude that Diverse was waiting for an alternate "reason to fortuitously materialize" to "cover up" its "true, longstanding motivations for firing" him. *Hamilton*, 556 F.3d at 436.

The district court erred in its treatment of this evidence. First, the district court incorrectly concluded that there was altogether "no evidence that any supervisor did not want [Bergens] to be the general manager." Opinion, R.61, PageID.1773. In fact, substantial independent evidence allows the conclusion that Delahunt and MacDonald did not intend to promote Bergens. *See supra* at 51–53. And the district court failed to consider Bergens's own sworn testimony as evidence, which this Court has recognized to be error. *See Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286 (6th Cir. 2012).

53

Second, the district court erred in concluding that, "[t]o the extent [Bergens] alleges that Defendants did not want him to take the general manager position, the evidence directly contradicts this contention." Opinion, R.61, PageID.1773. The district court cherry-picked these findings, noting only that "internal documents" reflected that Bergens was still slated to be the general manager and that Bergens at times "continued to discuss" the Blue Moose Alcoa even after his stroke. Opinion, R.61, PageID.1773. But viewed in the light most favorable to Bergens, neither reference would prevent a jury from finding, as Bergens testified, that his inclusion in preparations for the Alcoa decreased and that Diverse intended not to promote him even before the moonshine prank occurred. Bergens Dep., R.32-6, PageID.1144. Evaluating the evidence of Diverse's prior intention to terminate Bergens requires the weighing of "credibility, which is appropriate for resolution by a trier of fact." *Kean v. Brinker Int'l, Inc.*, 140 F.4th 759, 775 (6th Cir. 2025).

> **(d) *Diverse conducted no investigation and failed to follow its progressive-discipline policy before firing Bergens.***

Finally, Diverse's failure to conduct any semblance of an investigation into Bergens's conduct or to follow its progressive-discipline policy shows how thinly the moonshine prank conceals Diverse's true motivations.

MacDonald and Delahunt did not make even a half-hearted attempt to investigate the moonshine prank before using it as an excuse

to fire Bergens. They didn't bother to watch the full video of the incident, which would have revealed King returning to the office and chatting with Bergens. Delahunt Dep., R.43-3, PageID.1643. They didn't even speak with either King or Biddle, the supposed victims. Delahunt Dep., R.43-3, PageID.1644.

While an employer's "investigation process does not need to be perfect…the employer must make 'a reasonably informed and considered decision before taking an adverse employment action'" for the information it produces to refute a claim of pretext. *Escher v. BWXT Y-12, LLC*, 627 F.3d 1020, 1030 (6th Cir. 2010). Diverse's "investigation" fell well below this standard.

Delahunt and MacDonald also made no attempt to follow Diverse's progressive-discipline policy, which requires managers to make "every attempt…to advise employees of improper conduct…to avoid discharge or dismissal, if possible." Employee Handbook, R.39-1, PageID.1488.

This "failure on [Diverse's] part to follow its progressive-discipline policy…can be considered as part of the constellation of evidence" showing pretext. *Kean*, F.4th at 776. Diverse's abandonment of its own processes and policies shows pretext.

### (3) Diverse offered insufficient reasons to justify firing Bergens because it treated similarly situated employees more favorably.

Last, Diverse's stated reasons for firing Bergens were insufficient to justify its decision: It consistently treated similarly situated employees

who were not disabled more favorably than Bergens. When responding to other employees' misconduct, Diverse either followed its progressive-discipline policy, slowly escalating its concerns from verbal conversations to written warnings, or else didn't discipline the employees at all. Only after Bergens's stroke did Diverse abandon its progressive-discipline policy, precipitously replacing Bergens with someone who was not disabled.

The district imposed an overly stringent standard for comparator evidence. Comparators are "similarly situated" employees who were "not fired despite engaging in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Moore v. Coca-Cola Bottling Co. Consol.*, 113 F.4th 608, 625 (6th Cir. 2024). This does not require "an exact correlation to another employee receiving favorable treatment," but instead merely a showing that the other employee is "similar in all of the relevant aspects." *McNeal v. City of Blue Ash*, 117 F.4th 887, 896 (6th Cir. 2024).

Relevant considerations include whether the employee "dealt with the same supervisor," was "subject to the same standards," and engaged in "substantially identical conduct…without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* "However, [this Court has] consistently said that [these] are not inflexible requirements, and instead

56

should be considered and applied on a case-by-case basis." *Spratt v. FCA US LLC*, 812 F. App'x 348, 353 (6th Cir. 2020).

The district court took an impermissibly inflexible approach to comparator evidence. It held that only one other employee—Robert Cartree—engaged in "substantially identical conduct," Opinion, R.61, PageID.1774, and denied that any other employee was sufficiently similar to provide comparator evidence. Opinion, R.61, PageID.1774. That was wrong. Even a single comparator that meets the above standard constitutes a "direct attack on the credibility of the employer's proffered motivation for [firing] the plaintiff" and "creates a genuine, triable issue of material fact," prohibiting summary judgment. *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). But even imperfect comparisons can be combined with other circumstantial evidence to show "that the presumptively valid reasons for [firing Bergens] were in fact a coverup for a…discriminatory decision." *McDonnell Douglas*, 411 U.S. at 805.

### (a)   Diverse never fired Robert Cartree for dumping old bottle caps into the same backpack it fired Bergens for reaching in.

The district court properly held that Cartree's actions—"dumping a pan of old bottle caps into [King's] backpack"—were "substantially identical conduct" to Diverse's stated reason for firing Bergens. Opinion, R.61, PageID.1774. It erred, however, in dismissing Cartree as a comparator based on its observations that (1) he and Bergens "held

57

different positions" and (2) "Perham testified that she was not aware of the incident." Opinion, R.61, PageID.1775.

First, the difference between Bergens's and Cartree's positions was immaterial. MacDonald described Bergens's conduct as a "zero tolerance issue," for which any employee "deserve[d] to be fired no matter what." MacDonald Dep., R.32-5, PageID.979. This flatly contradicts the "different roles" defense to Cartree as a comparator, since Cartree was neither fired nor disciplined for his bottle-caps prank.

Second, the district court wrongly credited Perham's unsupported testimony denying knowledge of the Cartree incident over Bergens's own. This overstepped the court's proper role at summary judgment, which is neither to "make credibility determinations [n]or weigh the evidence" because these "are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Applying the standard properly, and assessing comparators "on a case-by-case basis," Diverse's treatment of Cartree is sufficient in itself to create a genuine issue of material fact on pretext. *Spratt*, 812 F. App'x at 353.

### (b)   *Diverse never fired Daniel King for sexually harassing his subordinates.*

While Diverse purportedly fired Bergens for being the butt of a joke-gone-wrong and allegedly breaking the trust of his coworkers, it hardly

58

disciplined and largely ignored Daniel King's lengthy record of pranks, immaturity, and harassment. This sharp inconsistency shows pretext.

Diverse tolerated an array of misbehavior from King. Perham, King's boss, knew that he gave away free food from the restaurant in return for Ole Smoky moonshine before she "put a stop to it." Perham Dep., R.32-4, PageID.790. She "received multiple complaints" of his "immature" conduct, ultimately deeming him "unmanageable." King Dep., R.32-1, PageID.477, 522. Diverse even had to conduct an investigation into King's treatment of his servers after one of them accused him of sexism. King Dep., R.32-1, PageID.471–72.

Then, to top it off, King and another manager used a potato and other vegetables to make a "penis and…testicles," adding "sour cream like it was ejaculating." Bergens Dep., R.32-6, PageID.1129. King then displayed his handiwork to the servers—his direct subordinates—in the lunch line, telling them "your lunch is ready." Bergens Dep., R.32-6, PageID.1129.

But when Perham told MacDonald about the harassment (supposedly another "zero tolerance" issue, MacDonald Dep., R.32-5, PageID.979), MacDonald just "spoke to…King about it." MacDonald Dep., R.32-5, PageID.994. He did not consider firing King, or even "write him up" for the behavior. MacDonald Dep., R.32-5, PageID.994. The district court credited Diverse's claim that Bergens's looking in King's bag—but not King's sexual harassment—constituted an "immediate

59

breach of trust" for which he deserved to be fired. MacDonald Dep., R.32-5, PageID.989.

The district court reached this conclusion because King's conduct was not "substantially identical" to Bergens's. Of course, peeking into a bag and sexually harassing one's subordinates are different types of behavior. But there can be no question that King's conduct was far worse. And that's what matters for purposes of pretext analysis. Evidence of "acts…of [even] comparable seriousness" by employees outside the protected class is "[e]specially relevant" to pretext. *McDonnell Douglas*, 411 U.S. at 804. By this logic, comparators who engaged in more egregious behavior present *stronger* evidence of pretext. Complacency in the face of major violations makes firing someone for a minor infraction even more suspicious.

This evidence should be considered alongside Diverse's adherence to its progressive-discipline policy for (1) an assistant manager described as a "compulsive liar" and "very toxic," Perham Dep., R.32-4, PageID.776; (2) another manager who posted a video of himself "spitting and cursing" in the restaurant kitchen to social media, Bergens Dep., R.32-6, PageID.1170; and (3) an employee caught drinking on the job three times, Bergens Dep., R.32-6, PageID.1169.

60

### *(c)    Diverse never fired Jack Coppinger for getting one of his subordinates pregnant. Instead, it promoted him.*

Most telling of all is how Diverse treated Coppinger, the person it hired to replace Bergens. During his training, Coppinger had a sexual relationship with one of his servers and got her pregnant. MacDonald Dep., R.32-5, PageID.983–84; Delahunt Dep., R.32-3, PageID.676–77. But instead of firing Coppinger, see Employee Handbook, R.39-1, PageID.1491, Diverse promoted him—instead of Bergens—to general manager. Evidence that Coppinger "received a promotion after" sleeping with a subordinate "furthers [Bergens]'s argument that there is a triable issue as to pretext." *Spratt*, 812 F. App'x at 355.

But Coppinger's misconduct did not end there. As general manager, he discussed "drinking," "drugs," and "partying" with his subordinates, as well as "his exploits with ladies." MacDonald Dep., R.32-5, PageID.983. And yet, Diverse followed its progressive-discipline policy once again, starting with repeated "counseling" meetings. Delahunt Dep., R.32-3, PageID.671.

A jury could infer pretext from Diverse's treatment of Cartree, King, and Coppinger.

## CONCLUSION

Because a jury could conclude that Diverse fired Bergens because of his disability, this Court should reverse the district court's grant of summary judgment.

61

Date: July 23, 2025                    Respectfully submitted,


                                       s/ Adam W. Hansen
                                       Adam W. Hansen
                                       APOLLO LAW LLC
                                       333 Washington Avenue North
                                       Suite 300
                                       Minneapolis, MN 55401
                                       (612) 927-2969
                                       adam@apollo-law.com

                                       Emma Freeman
                                       APOLLO LAW LLC
                                       1000 Dean Street
                                       Suite 101
                                       Brooklyn, NY 11238

                                       David A. Burkhalter, II
                                       D. Alexander Burkhalter, III
                                       Zachary J. Burkhalter
                                       BURKHALTER LAW FIRM, P.C.
                                       111 South Central Street
                                       Knoxville, TN 37901

                                       *Counsel for Appellant*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify pursuant to Fed. R. App. P. 32(g)(1) that the Appellant's brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,992 words, in other words, no more than 13,000 words, including footnotes and excluding the parts of the brief exempted by Fed. R. App. P. 32(f). In addition, this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, Century Schoolbook font in 14 point size, with footnotes in Century Schoolbook font in 14 point size.


s/ Adam W. Hansen
Adam W. Hansen

**ADDENDUM**

**DESIGNATION OF RELEVANT
DISTRICT COURT DOCUMENTS**

| Dkt. No. | Description of Document | PageID |
|---|---|---|
| 1 | Complaint | 1–20 |
| 1-1 | EEOC Charge | 21–22 |
| 26 | Defendant's Statement of Undisputed Material Facts | 138–51 |
| 27 | Memorandum of Law in Support of Defendants' Motion for Summary Judgment | 152–76 |
| 28 | Mark Bergens Deposition Excerpts[3] | 186–13 |
| 28 | Mark Bergens Text Messages | 214–73 |
| 28 | Paul Delahunt Deposition Excerpts | 274–98 |
| 28 | Daniel King Statement | 315–17 |
| 28 | Scott MacDonald Deposition Excerpts | 318–35 |

---

[3] This and other addendum documents are parts of larger docket entries that contain many distinct documents. Entry 28, for example, is the "Appendix to Memorandum of Law in Support of Defendants' Motion for Summary Judgment." Descriptions of the individual documents are listed here and in the brief for greater clarity.

| 28 | Blue Moose Alcoa Training Calendar | 420 |
|---|---|---|
| 28 | Paula Perham Deposition Excerpts | 422–37 |
| 28 | Defendants' Responses to Plaintiff's First Set of Interrogatories and Document Requests | 438–55 |
| 32-1 | Daniel King Deposition Excerpts | 464–527 |
| 32-1 | Defendants' Responses to Plaintiff's First Set of Requests for Admission | 528–39 |
| 32-2 | Marty Armbrester Deposition Excerpts | 598–625 |
| 32-3 | Paul Delahunt Deposition Excerpts | 626–89 |
| 32-3 | Statement of Paul Delahunt | 763–65 |
| 32-4 | Paula Perham Deposition Excerpts | 767–846 |
| 32-4 | Paula Perham Text Messages | 856–923 |
| 32-5 | Scott MacDonald Deposition Excerpts | 926–1002 |
| 32-5 | Jack Coppinger New Hire Form | 1090 |
| 32-5 | Paul Delahunt Emails | 1091 |
| 32-6 | Mark Bergens Deposition Excerpts | 1099–231 |

| 32-6 | Mark Bergens Resume | 1232–33 |
|------|---------------------|---------|
| 39-1 | Employee Handbook | 1476–546 |
| 40 | Defendants' Response to Plaintiff's Statement of Disputed Material Facts | 1578–614 |
| 43-3 | Paul Delahunt Deposition Excerpts | 1640–44 |
| 61 | Memorandum Opinion and Order Granting Summary Judgment | 1766–78 |
| 62 | Entry of Judgment | 1779 |
| 64 | Plaintiff's Notice of Appeal | 1789–90 |

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this 23rd day of July, 2025, I caused the foregoing brief and addendum to be filed electronically with the Court, where they are available for viewing and downloading from the Court's ECF system, and that such electronic filing automatically generates a notice of electronic filing constituting service. I certify that all parties required to be served have been served.

s/ Adam W. Hansen
Adam W. Hansen
