Case No. 25-5169

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

---

MARK F. BERGENS,

*Plaintiff-Appellant*,

v.

DIVERSE CONCEPTS, LLC, ISLAND AMENITIES, LLC, and SMOKY
MOUNTAIN BLUE MOOSE, LLC,

*Defendants-Appellees*.

---

On Appeal from the United States District Court
For the Eastern District of Tennessee (Case No. 3:23-cv-00304)
The Honorable Clifton L. Corker

---

**BRIEF FOR APPELLEES**

---

Brandon L. Morrow
   *Counsel of Record*
KRAMER RAYSON LLP
P.O. Box 629
Knoxville, TN 37901-0629
(865) 525-5134
bmorrow@kramer-rayson.com

## CORPORATE DISCLOSURE STATEMENT

Defendant-Appellees Diverse Concepts, LLC, Island Amenities, LLC, and Smoky Mountain Blue Moose, LLC makes the following disclosures as required by Sixth Circuit Rule 26.1:

1.     Are said parties a subsidiary or affiliate of a publicly owned corporation? If yes, list the identity of the parent corporation or affiliate and the relationship between it and the named party.

No.

2.     Is there a publicly owned corporation, not a party to the appeal that has a financial interest in the outcome?

No.

By: /s/ Brandon L. Morrow
Brandon L. Morrow
*Counsel of Record*
KRAMER RAYSON LLP
P.O. Box 629
Knoxville, Tennessee 37901-0629
(865) 525-5134
bmorrow@kramer-rayson.com

## TABLE OF CONTENTS

Corporate Disclosure Statement.................................................................i

Table of Contents ......................................................................................i

Table of Authorities................................................................................ iii

Identification of the Parties ....................................................................6

Statement in Support of Oral Argument.................................................6

Statement of Jurisdiction.........................................................................7

Issue Presented for Review .....................................................................7

Introduction .............................................................................................8

Statement of the Case ...........................................................................12

I.    Factual Background ......................................................................12

    A.    The Company and its Organization .........................................12

    B.    Bergens is hired at Timberwood Grill. .....................................13

    C.    Bergens is tapped to be the General Manager of Blue
        Moose Alcoa...............................................................................13

    D.    Bergens suffers a stroke and goes out on medical leave..........14

    E.    Bergens returns to work...........................................................15

    F.    Bergens' stroke didn't affect his promotion.............................16

    G.    Conversations about Bergens' medical condition and
        ability to do the job. .................................................................17

    H.    Bergens goes through coworkers' belongings without
        permission, breaking the trust of his employer. ......................19

    I.    The Company investigates. .......................................................22

    J.    Bergens is terminated. .............................................................24

    K.    After his termination, Bergens admits his actions were ill-
        advised. .....................................................................................26

Summary of Argument...........................................................................27

Argument................................................................................................29

i

I.   The District Court did not err in concluding that no reasonable jury could find that the Company fired Bergens because of his disability. ............................................................................................29

   A.   Standard of Review.................................................................30

   B.   Bergen's has failed to show that the Company's legitimate, non-discriminatory and non-retaliatory justification for his termination was pretextual. ...................................................33

   C.   Bergens' own testimony, and video footage of the incident, confirm that his termination is based in fact...........................35

   D.   The Company fired Bergens solely due to the moonshine incident and his lies during the subsequent investigation......38

     1.   Bergens intervening misconduct breaks any causal inference offered by temporal proximity. .................................39

     2.   The record and Bergens own testimony show he was not subjected to a hostile or discriminatory work environment.....40

     3.   The Company stuck to its plan to promote Bergens after the stroke.................................................................................45

     4.   The Company investigated Bergens' conduct and terminated him after he admittedly lied during the course of the investigation.........................................................................49

   E.   Bergens cannot identify a comparator. ...................................53

     1.   Robert Cartree.................................................................54

     2.   Daniel King ...................................................................56

     3.   Jack Coppinger...............................................................56

   F.   The honest-belief rule applies. ...............................................57

Conclusion ...............................................................................................59

Certificate of Compliance.......................................................................60

Certificate of Service ..............................................................................61

Addendum ...............................................................................................62

## TABLE OF AUTHORITIES

**CASES**

*6 W. Corp. v. N.L.R.B.*, 237 F.3d 767 (7th Cir. 2001) ............................53

*Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308 (6th Cir. 2019) 44

*Barr v. Lafon*, 538 F.3d 554, 561 (6th Cir. 2008)....................................30

*Bashaw v. Majestic Care of Whitehall, LLC*, 130 F.4th 542 (6th Cir. 2025)........................................................................ 11, 33, 36, 53

*Bennett v. Hurley Med. Ctr.*, 86 F.4th 314 (6th Cir. 2023) ....................33

*Blizzard v. Marion Tech. Coll.*, 698 F.3d 275 (6th Cir. 2012) .... 51, 54, 58

*Braithwaite v. Timken Co.*, 258 F.3d 488 (6th Cir. 2001) ......................34

*Bush v. Dictaphone Corp.*, 161 F.3d 363 (6th Cir. 1998).......................43

*C.S. v. McCrumb*, 135 F.4th 1056 (6th Cir. 2025) .................................30

*Chen v. Dow Chemical Co.*, 580 F.3d 394 (6th Cir. 2009) ..................8, 34

*Creelgroup, Inc. v. NGS Am. Inc.*, 518 F. App'x 343 (6th Cir. 2013) 36, 49

*Dews v. A.B. Dick Co.*, 231 F.3d 1016 (6th Cir. 2000) ...........................34

*Donald v. Sybra, Inc.*, 667 F.3d 757 (6th Cir. 2012)..............................40

*E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753 (6th Cir. 2015) ............. passim

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998) ...................................................................................... 44, 53

*Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409 (6th Cir. 2020) .................41

*Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406 (7th Cir. 1997)...............................................................................32

*Gordon v. United Airlines, Inc.*, 246 F.3d 878 (7th Cir. 2001) ...............32

*Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cnty. Metro Hum. Rels. Comm'n*, 508 F.3d 366 (6th Cir. 2007) ...............................................33

*Hannon v. Louisiana-Pac. Corp.*, 784 F. App'x 444 (6th Cir. 2019).......35

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) ....................................43

*James v. Petra Fin., LLC*, No. 15-2297-STA-CGC, 2015 WL 7289430 (W.D. Tenn. Nov. 178, 2015)........................................................37, 49

*Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783 (6th Cir. 2006) ................................................................................................38, 39

*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220 (10th Cir.2000) ......................................................................................................52

*Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862 (6th Cir. 2007)..........41

*Kuhn v. Washtenaw Cty.*, 709 F.3d 612 (6th Cir. 2013) .........................39

*Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078 (6th Cir. 1994) ................................................................................................38, 53

*Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883 (6th Cir. 2020)34, 54

*Mitchell v. Toledo Hospital*, 964 F.2d 577 (6th Cir. 1992) ....................54

*Perkins v. Hininger*, No. 3:21-CV-00901, 2023 WL 4687196 (M.D. Tenn. July 21, 2023).........................................................................36, 49

*Reeves v. Sanderson Plumbing Prods., Inc.* 530 U.S. 133 (2000)...........31

*Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544 (6th Cir. 2004).............................................................................................44

*Scott v. Harris*, 550 U.S. 372, 381 (2007).........................................37, 49

*Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274 (6th Cir. 2012)..51, 59

*Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555 (6th Cir. 2004)....31

iv

*Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) ............... 32

*Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394 (7th Cir. 1997) ......... 32

*Williams v. CitiMortgage, Inc.*, 498 F. App'x 532 (6th Cir. 2012) .... 36, 49

*Williams v. CitiMortgage, Inc.*, 498 F. App'x 532 (6th Cir. 2012) .......... 49

*Wingo v. Michigan Bell Tel. Co.*, 815 Fed. Appx. 43 (6th Cir. 2020) ..... 10, 39, 40

*Wright v. Murray Guard*, Inc., 455 F.3d 702 (6th Cir. 2006) ..... 51, 57, 58

STATUTES

28 U.S.C. §1291 ............................................................................ 7

28 U.S.C. §1367 ............................................................................ 7

42 U.S.C. § 12101 ......................................................................... 7

42 U.S.C. § 12112 .................................................................. 17, 41

## IDENTIFICATION OF THE PARTIES

Appellant will be referred to as "Bergens."

Appellees (collectively referred to as the "Company") are three related business entities. Diverse Concepts, LLC is a management company that provides operational oversight and support to several hotels, retail shops, entertainment venues, and restaurants. Timberwood Grill (Island Amenities, LLC) and Blue Moose Burgers & Wings (Smoky Mountain Blue Moose, LLC) are two such restaurants.

Paul Delahunt is the Company's Vice President of Operations, Scott MacDonald is the Director of Operations, Paula Perham is the General Manager of Timberwood Grill, and Marty Armbrester is the Company's Director of Human Resources. P. Delahunt Decl., R.28, PageID#: 180 ; Armbrester Dep., R.28, PageID#: 182–83.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This case focuses on the pretext analysis in employment discrimination cases under the *McDonnell Douglas* burden-shifting framework. Diverse submits that the opportunity to address these issues in greater detail to this Court, and to respond to inquiries from this

6

Court, through oral argument may aid the Court in its decision-making process.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over the Americans with Disabilities Act ("ADA") claims pursuant to 42 U.S.C. § 12101 *et seq.*; it had jurisdiction over Bergens' Tennessee Disability Act ("TDA") claims pursuant to 28 U.S.C. §1367.

This Court has jurisdiction over the appeal pursuant to 28 U.S.C. §1291. The district court entered final judgment on February 3, 2025. Entry of Judgment, R.62, PageID#: 1779. Bergens filed a notice of appeal on February 28, 2025. Notice of Appeal, R.64, PageID#: 1789.

## ISSUE PRESENTED FOR REVIEW

Whether the district court erred in concluding that no reasonable jury could find that Bergens satisfied his burden to show pretext after he was terminated for going through co-workers' possessions without their permission?

## INTRODUCTION

In this disability discrimination and retaliation case, the focus is on pretext. To show pretext, Bergens had to "produce sufficient evidence from which a jury could reasonably reject" the Company's reason for his termination. *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citation omitted).

Bergens had recently been tapped to manage a new restaurant for the Company. With this promotion, the Company increased his responsibilities and expected more of him. Shortly after being informed of this promotion, Bergens had a stroke and he was out of work for a few weeks. When he returned, he had some mobility issues but was generally able to perform his job duties. Bergens, however, was fired (almost two months after his stroke) when he rummaged through his co-workers' personal bags without their permission, causing the Company to lose trust in him. The district court correctly held that Bergens did not produce sufficient evidence to undermine the reason for his termination.

Pretext "is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id.* at 400 n.4. Bergens makes several arguments in an attempt to show pretext, but none of them are

8

supported by commonsense. For example, Delahunt, the same person who Bergens now contends discriminated against him, made the decision to pay Bergens during his medical leave even though he did not have any accrued PTO. Bergens Dep., R.28, PageID#: 189. Hardly a day went by during Bergens' medical leave that one of his supervisors did not text or call to check on his condition, and one even visited him in the hospital. Bergens Dep., R.28, PageID#: 189. And once Bergens returned to work, there was no accommodation Bergens requested that the Company did not grant. Bergens Dep., R.28, PageID#: 191.

Bergens' stroke didn't affect the Company's plans to have him manage this new restaurant. The Company continued to include Bergens in meetings about his new role and communicated with him about it right up to the point he violated the Company's trust.

Bergens attempts to downplay the reason for his termination—rummaging through his co-workers' personal bags without permission—as a joke. But there's no dispute that Bergens' actions were no laughing matter. He admits his co-workers were upset by what he did. Bergens Dep., R.28, PageID#: 198–99, 204–05. Bergens' own beliefs cannot

9

undermine the Company's conclusion that what he did was a breach of trust.

He says that the reason for his termination has no basis in fact. A tough argument when he admits the factual basis (*i.e.*, that he looked through his co-worker's personal bags without their permission and they were upset by it). Bergens Dep., R.28, PageID#: 198–99, 204–05. He classified his conduct as a "mistake" and the situation as being his "fault." Bergens Dep., R.28, PageID#: 204; Bergens Dep. Exh. 7, R. 39-1, PageID#: 1461.

He points to temporal proximity. But his lapse in judgment in going through his co-workers' belongings disrupts the purported causal chain. *Wingo v. Michigan Bell Tel. Co.*, 815 Fed. Appx. 43, 47 (6th Cir. 2020).

He claims stray comments (from non-decisionmakers) about his disability prove pretext. But Bergens didn't consider these comments discriminatory—he found them funny—and he never complained about them. Bergens Dep., R.28, PageID#: 190–91.

He assumes—without any support—that the Company backed off the plan to promote him once his disability materialized. But the Company's actions don't support that theory. After Bergens' stroke,

10

Delahunt still made sure Bergens was involved in the marketing and community outreach associated with the new restaurant. Delahunt Dep., R. 39-1, PageID#: 1469. And MacDonald exchanged a multitude of texts with Bergens about his new role *after his stroke*. Bergens Dep. Exh. 6, R.28, PageID#: 226–70. Even Bergens admits that he "was still slated to be the GM [at the new restaurant] until" he went through his co-workers' bags without their permission. Bergens Dep., R.39-1, PageID#: 1397.

He second guesses the Company's investigation into what happened. But we remind the Court that he was caught on video. And he ultimately admitted to his misdeeds (after initially being untruthful). All of this caused the Company to lose trust in him and terminate his employment. *Bashaw v. Majestic Care of Whitehall, LLC*, 130 F.4th 542, 549 (6th Cir. 2025) ("…an employer may terminate an employee whose actions undermine the employer's trust."). As the decisionmaker, Delahunt, put it, Bergens' actions exhibited a "a clear lack of judgment and lack of character that [we] can't have working in any restaurant." Delahunt Dep., R. 39-1, PageID#: 1466.

In a last-ditch effort, he points the finger at other employees who he says engaged in misconduct. But neither his alleged comparators nor

11

their conduct is similar. The District Court didn't take a formulaic approach in rejecting his apples-to-oranges comparator argument; it took a practical one, supported by the law of this Circuit.

Bergens did not meet his burden of establishing pretext. Summary judgment should be affirmed.

## STATEMENT OF THE CASE

### I. Factual Background

#### A. The Company and its Organization

Diverse Concepts is a management company that provides operational oversight and support to several hotels, retail shops, entertainment venues, and restaurants. Timberwood Grill and Blue Moose Burgers and Wings are two such restaurants. Delahunt Decl., R.28, PageID#: 179.

Bergens worked at Timberwood Grill in Pigeon Forge, Tennessee. Bergens Dep., R.28, PageID#: 188. After a few months of employment, he was tapped to be the General Manager of a new restaurant scheduled to open in a few months, Blue Moose Burgers & Wings in Alcoa, Tennessee ("Blue Moose Alcoa"). Bergens Dep., R.28, PageID#: 188; MacDonald Dep. R.28. PageID#: 321–22.

12

Based on his existing role and his soon-to-be promoted role, Bergens' reporting structure was a bit different than a typical employee. He was supervised on a day-to-day basis by Timberwood Grill General Manager, Paula Perham, but he also reported to the Company's Vice President of Operations, Paul Delahunt, and Director of Operations, Scott MacDonald.

**B. Bergens is hired at Timberwood Grill.**

Bergens began working as an assistant manager at Timberwood Grill on May 9, 2022. Bergens Dep., R.28, PageID#: 188. Bergens was hired to learn all of the operations of the restaurant because the Company believed that if he was successful, he could be promoted to a restaurant general manager, perhaps at another one of the Company's restaurants. Bergens Dep., R.28, PageID#: 188.

**C. Bergens is tapped to be the General Manager of Blue Moose Alcoa.**

In mid-August, Bergens was offered the position of general manager of the new Blue Moose Alcoa location, which he accepted. Bergens Dep., R.28, PageID#: 188; MacDonald Dep., R.28. PageID#: 321–22.

At the time, the Company planned for him to remain in his position as an assistant manager at Timberwood Grill until November 2022. Bergens Dep., R.28, PageID#: 188. Then, in late November 2022, Bergens would transfer to the Blue Moose location in Pigeon Forge, so that he could train as a general manager and he could train assistant managers for the new Blue Moose Alcoa location. Bergens Dep., R.28, PageID#: 188.

**D. Bergens suffers a stroke and goes out on medical leave.**

On August 22, 2022, Bergens suffered a stroke. Bergens Dep., R.28, PageID#: 188–89. The Company didn't discard this relatively new employee; instead, it provided him with support and paid leave, a benefit to which he was not entitled. MacDonald visited him in the hospital and frequently checked in on his condition. Bergens Dep., R.28, PageID#: 189. Bergens was out of work for over two weeks and he hadn't accrued any PTO. Bergens Dep., R.28, PageID#: 189. Delahunt, however, made sure that Bergens didn't miss a paycheck during his medical leave. Bergens Dep., R.28, PageID#: 189; Delahunt Dep., R.28, PageID#: 297.

Even before Bergens returned to work, the Company advised him that it would support his accommodation needs once he was able to work again. Perham told Bergens that once he returned she would adjust the

14

schedule to his needs. Bergens Dep., R.28., PageID#: 192; Bergens Dep. Exh. 4, R.28., PageID#: 214–25. She also told him that she would pray for his recovery. Bergens Dep., R.28., PageID#: 192; Bergens Dep. Exh. 4, R.28., PageID#: 214–25.

**E. Bergens returns to work.**

Bergens returned to work at Timberwood Grill on September 5. He had limited mobility in his right arm, and he carried it in a sling upon his initial return. Bergens Dep., R.28., PageID#: 190. Bergens recognized that the Company had been gracious to him during his absence. He texted Delahunt the day he returned: "I wanted to thank you for working with me the past couple of weeks. I owe you guys." Bergens Dep., R.28., PageID#: 208; Bergens Dep. Exh. 10, R.28, PageID#: 271–73. The following conversation ensued:

> **Delahunt:** "Of course. You going to be okay?"
> **Bergens:** "Yes sir, doing PT and OT four times a week."
> **Delahunt:** "That's good news. See you soon."

Bergens Dep., R.28., PageID#: 209; Bergens Dep. Exh. 10, R.28, PageID#: 271–73.

There wasn't a single accommodation Bergens requested that the Company did not grant. Bergens Dep., R.28., PageID#: 191. Bergens had

15

an open line of communication to the Company about his condition and accommodations. MacDonald Dep., R. 28., PageID#: 323.  The Company was flexible with Bergens' schedule. Perham let Bergens tell her when he could work, so he was able to attend his doctor and physical therapy appointments. Bergens Dep., R.28., PageID#: 192' MacDonald Dep., R. 28., PageID#: 323; Perham Dep., R.28, PageID#: 426–27.

## F. Bergens' stroke didn't affect his promotion.

Once Bergens returned to work, the Company still planned on him being the GM at Blue Moose Alcoa. These plans are embodied in a multitude of text messages exchanged between MacDonald and Bergens after his return. Bergens Dep. Exh. 6, R.28, PageID#: 226–70. Many of these text messages explicitly discuss Bergens' new position. Bergens Dep. Exh. 6, R.28, PageID#: 226–70. In fact, as late as October 18 (the day before he was terminated), Bergens and MacDonald exchanged texts about a marketing meeting for Blue Moose Alcoa scheduled for later that day. Bergens Dep. Exh. 6, R.28, PageID#: 269. There was no nefarious plan afoot to strip him of his promotion. These texts show just the opposite—the Company's plan for Bergens to be the GM of Blue Moose Alcoa was still in place, irrespective of his medical condition. And the

16

opening timeline document for the new restaurant, dated October 13, 2022, still listed Bergens as the GM. MacDonald Dep. 104, R.28, PageID#: 334; MacDonald Dep. Ex. 17, R.28, PageID#: 419–20; Delahunt Dep. , R.28, PageID#: 293.

### G. Conversations about Bergens' medical condition and ability to do the job.

Bergens had a stroke, was hospitalized, and returned to work with certain limitations. Of course, his employer was going to have some conversations with him about what he was—or was not—able to do. Not only is this sensible, it's lawful. 42 U.S.C.A. § 12112(d)(4)(B) ("A covered entity may make inquiries into the ability of an employee to perform job-related functions.").

It's important to understand what the GM role would entail. Everyone agreed it's less physically demanding, and more focused on coaching and leadership, something Bergens says he could've done "with one hand." Bergens Dep., R.28, PageID#: 206 ; MacDonald Dep., R.28, PageID#: 325; Delahunt Dep., R.28, PageID#: 285; Perham Dep., R.28, PageID#: 424.

Once litigation was underway, Bergens claimed that Delahunt made negative remarks to him about his stroke on about five different

17

occasions after he returned to work. He said that Delahunt told him he was susceptible to another stroke, asked him questions about how he could train himself and others, and told him that his recovery was not proceeding as rapidly as expected. Bergens Dep. , R.28, PageID#: 194.

However, the record demonstrates that Bergens' claims are contrary to what was actually said. (Delahunt Dep., R.28, PageID#: 290, 296–97; MacDonald Dep., R.28, PageID#: 324, 334. Rather, they talked with him about his "progress and just him getting better," and noted that he "was also far ahead of the training because of the time he spent at Timberwood [Grill]." MacDonald Dep., R.28, PageID#: 325–26; Delahunt Dep. , R.28, PageID#: 288. Delahunt Dep., R.28, PageID#: 290, 296–97; MacDonald Dep., R.28, PageID#: 324, 344. Delahunt had no concerns that Bergens might have more strokes in the future. Delahunt Dep., R.28, PageID#: 288. And Delahunt and MacDonald never discussed whether Bergens would be unable to physically perform the GM position. MacDonald Dep., R.28, PageID#: 325. With respect to the recovery timeline, Bergens admits that the it was more self-imposed than due to anything Delahunt said because he (Bergens) expected to recover quicker than he actually did. MacDonald Dep., R.28, PageID#: 206.

18

## H. Bergens goes through coworkers' belongings without permission, breaking the trust of his employer.

The Company had tapped Bergens to lead a new restaurant that was set to open in a few months. It expected a lot of him, more so than lower-level employees. It needed to be able to trust him. That trust was broken on October 18, 2022.

Bergens was scheduled to work at Timberwood Grill that day with fellow Assistant Managers Daniel King and Kristy Biddle. King Dep., R.28, PageID#: 309–10, 312; King Dep. Exh. 9, R.28, PageID#: 315; King Dep. Exh. 11, R.28, PageID#: 316–17; Bergens Dep., R.28, PageID#: 197. Once King arrived for his shift, Bergens began telling King how he planned to socialize later in the evening with his wife and their friends. King Dep., R.28, PageID#: 305, 309–10, 312; King Dep. Exh. 9, R.28, PageID#: 315; King Dep. Exh. 11, R.28, PageID#: 316–17. A little later, Bergens asked King to get him some moonshine from a nearby retailer so he could share it with his wife and friends later. King Dep., R.28, PageID#: 305, 309–10, 312; King Exh. 9, R.28, PageID#: 315; King Dep. Exh. 11, R.28, PageID#: 316–17. It wasn't unusual for King to do that (he knew the managers of the moonshine retailer), but the restaurant was

19

getting busy, and King told Bergens he didn't have time to leave. King Dep., R.28, PageID#: 305; King Dep. Exh. 11, R.28, PageID#: 316–17.

Bergens was persistent. Over the next several hours, he continued to pester King about the moonshine. King Dep., R.28, PageID#: 305; King Dep. Exh. 11, R.28, PageID#: 316–17. Bergens' "asks" transformed into "demands." King Dep., R.28, PageID#: 305; King Dep. Exh. 11, R.28, PageID#: 316–17. At one point, King told Bergens to go get it himself. Bergens Dep., R.28, PageID#: 197. Undeterred, Bergens continued lobbying King for moonshine, so King eventually left and returned with two jars of moonshine. King Dep., R.28, PageID#: 305.

This is where the joke or prank takes place. When King returned to the restaurant with the moonshine, he jokingly told Bergens that he gave the moonshine to Biddle because she wanted it more than him. Bergens Dep., R.28, PageID#: 198. After Bergens' incessant pestering about the moonshine, King joked with Bergens about giving it to someone else, something Bergens' recognized. King Dep., R.28, PageID#: 305; Bergens Dep., R.28, PageID#: 198.

This is where the joke or prank ends, though. King never anticipated that saying this to Bergens would lead him to go through his

20

or Biddle's bags. King Dep., R.28, PageID#: 306. But that is what happened. Bergens then went into the manager's office where he opened and searched both Biddle's and King's bags for the moonshine bottles. Bergens Dep., R.28, PageID#: 199. Bergens admits that he did not get permission from either King or Biddle to search their bags. Bergens Dep., R.28, PageID#: 198–99.

As King was walking through the kitchen, he saw Bergens on the security camera, which monitors the manager's office, rummaging through his and Biddle's personal bags. King Dep., R.28, PageID#: 306, 310, 312; King Dep. Exh. 11, R.28, PageID#: 316–17. This is captured in the video footage of the incident:

|  |  |
|:---:|:---:|
| Bergens reaching in Biddle's bag. | Bergens reaching in King's bag. |

Perham Dep., R.28, PageID#: 431; Perham Dep. Exh. 8, R.28, PageID#: 456. King felt that this was an invasion of privacy and breach of trust. Perham Dep., R.28, PageID#: 431; Perham Dep. Exh. 8, R.28, PageID#: 456. King told Biddle about what happened. King Dep., R.28, PageID#: 307. She was mad and King was upset at what Bergens had done. King Dep., R.28, PageID#: 307.

## I. The Company investigates.

The next morning, King and Biddle told Perham what Bergens had done. Perham Dep., R.28, PageID#: 430, 432; King Dep., R.28, PageID#: 307. Based on what King and Perham had reported to her, Perham understood that Bergens had requested King to get him moonshine, King repeatedly said no several times but ultimately acquiesced, and then jokingly told Bergens that he had given the moonshine to Biddle. Perham Dep., R.28, PageID#: 432. As Perham put it, what started out in a "joking manner" was escalated to something far more serious when Bergens rummaged through his co-workers' bags without their permission. Perham Dep., R.28, PageID#: 432–33.

According to Perham, Biddle and King "were very upset that their bags were rummaged through." Perham Dep., R.28, PageID#: 433. Biddle

22

"was very offended" and "very upset" that Bergens had gone through her personal property, as she "felt extremely violated," while King "was very aggravated." Perham Dep., R.28, PageID#: 433–34; King Dep., R.28, PageID#: 307.

Perham then forwarded this information to MacDonald. Perham Dep., R.28, PageID#: 433. Perham took the situation seriously because of the importance "of somebody going through somebody [else's] personal property." Perham Dep., R.28, PageID#: 431. Perham called MacDonald and told him that video footage demonstrated that Bergens had gone through King's and Biddle's bags. MacDonald Dep., R.28, PageID#: 332. MacDonald spoke with Delahunt to apprise him of the incident. MacDonald Dep., R.28, PageID#: 332; Delahunt Dep., R.28, PageID#: 276.

Delahunt and MacDonald then reviewed the video footage and the report they received from Ms. Perham. Bergens' actions caused them to lose trust in him. Delahunt Dep., R.28, PageID#: 276; MacDonald Dep., R.28, PageID#: 328, 333. Delahunt points out that, based on the video, Bergens "left to make sure the coast was clear, go back in, frisk the bags . . . and the entire time [he was] looking out to make sure that nobody

23

was around" Delahunt Dep., R.28, PageID#: 277–78. To Delahunt, this was "a clear lack of judgment and a lack of character that" he could not "have working in any restaurant." Delahunt Dep., R.28, PageID#: 277–78.

MacDonald reacted similarly: "How can I look at the rest of my employees and tell them that this person is going to work with them or over them?" MacDonald Dep., R.28, PageID#: 333.

After Delahunt and MacDonald reviewed the video and the report from Perham, they called her to discuss the matter further. Perham confirmed that Bergens had gone through his co-workers' bags without permission. Delahunt Dep., R.28, PageID#: 276, 280. Perham's concern was that Bergen's actions had violated the trust of the other managers in such a way that he could no longer work with them. Perham Dep., R.28, PageID#: 435.

**J. Bergens is terminated.**

Later that day, October 19th, MacDonald and Delahunt called Bergens. MacDonald Dep., R.28, PageID#: 329. Based on what Delahunt had already learned from the investigation, he testified "we had pretty much decided to fire" Bergens but wanted to discuss the incident with

24

him in case "there [was] something that we're not seeing."  Delahunt Dep., R.28, PageID#: 279. The call did not begin with a termination discussion. Rather, Delahunt gave Bergens three opportunities to tell the truth about the October 18th incident, and Bergens was untruthful each time. Delahunt Dep., R.28, PageID#: 279. Bergens admits that when Delahunt asked him if he went through King's and Biddle's bags, he "said no." Bergens Dep., R.28, PageID#: 203–04. Bergens only admitted going through the bags once Delahunt told him that they had reviewed video footage. Delahunt Dep., R.28, PageID#: 279; MacDonald Dep., R.28, PageID#: 329.

Having been confronted with the video footage, Bergens changed his story claiming that the *whole* situation " was a joke" or a "prank." Delahunt Dep., R.28, PageID#: 279. It may have started that way, but Bergens transformed it into something far more serious. Believing that he could no longer trust Bergens, Delahunt terminated his employment during the phone call. Delahunt Dep., R.28, PageID#: 297. Although he consulted with MacDonald, Delahunt was the ultimate decisionmaker with respect to Bergens' termination. Delahunt Decl., R.28, PageID#: 180; Perham Dep. Exh. 1, R.28, PageID#: 445.

25

### K. After his termination, Bergens admits his actions were ill-advised.

Later on October 19th, Bergens sent MacDonald a series of texts asking the Company to reconsider his termination. He apologized for his behavior and admitted to making a "mistake." MacDonald Dep. Exh. 12, R.28, PageID#: 336–418.  He didn't say a word about his stroke, his recovery, discrimination, or retaliation.

The next day, Bergens sent an email to Delahunt and MacDonald again asking the Company to reconsider the termination decision. Delahunt Dep., R.28, PageID#: 280–81; MacDonald Dep. Exh. 19, R.28, PageID#: 421. In this email, Bergens admits that when he was looking for the moonshine he "was not thinking clearly," that the situation was his "fault," and that his actions were a "stupid mistake." MacDonald Dep. Exh. 19, R.28, PageID#: 421. There's no reference to his stroke, his recovery, discrimination, or retaliation in this communication, either.

Bergens admits he never complained about any allegedly discriminatory comments by Delahunt. Bergens Dep., R.28, PageID#: 195. He admits that he never requested any accommodation relating to his potential training at the Blue Moose Pigeon Forge and he never

26

complained to anyone that he had been denied an accommodation. Bergens Dep., R.28, PageID#: 212.

## SUMMARY OF ARGUMENT

The District Court did not err in concluding that no reasonable juror could find in favor of Bergens on his claims of disability discrimination and retaliation. The key question is that of pretext—specifically whether Bergens' termination for misconduct was pretext for disability discrimination. The facts and relevant caselaw show that Bergens' termination was not pretextual.

Summary judgment is appropriate where, as here, the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to his case. Furthermore, summary judgment remains an appropriate vehicle to dispose of discrimination claims in this Circuit, even when pretext is the key issue. The burden rests with Bergens to show pretext and he has failed at every turn to make the requisite showing. Accordingly, summary judgment was and remains the appropriate vehicle for disposing of Bergens claims.

Bergens' failure to show that the Company's legitimate, non-discriminatory and non-retaliatory justification for his termination was

27

pretext arises on a number of fronts. As a threshold matter, Bergens' own testimony, and video footage of the incident, confirm that his termination was based in fact. Bergens' intervening misconduct breaks any causal inference that might otherwise arise from the temporal proximity between his stroke and his termination.

Furthermore, the record and Bergens' own testimony show he was not subjected to a hostile or discriminatory work environment. Despite Bergens' protestations otherwise, contemporaneous documentary evidence shows that the Company stuck to its plan to promote Bergens after his stroke—communicating with him regarding the promotion up until the day before he was terminated. Quite simply, the Company investigated Bergens' conduct, found his conduct to be gravely concerning, and terminated him for it. The termination had nothing to do with his disability. Bergens has failed to point to any evidence that would indicate otherwise.

Even if Bergens could somehow make the initial showing of pretext—which he cannot and has not—his claims still fail as Delahunt had an honest belief based on particularized facts that he was terminating Bergens due to his misconduct. Accordingly, Bergens cannot

28

prove pretext because the honest-belief rule prevents it, even if Delahunt's belief in the end were shown to be mistaken.

Ultimately, Bergens—despite his various attempts—has failed to show that the Company's reason for terminating his employment was pretextual.

## ARGUMENT

**I.   The District Court did not err in concluding that no reasonable jury could find that the Company fired Bergens because of his disability.**

The District Court did not err in concluding that no reasonable juror could find in favor of Bergens on his claims of disability discrimination and retaliation. The key question is that of pretext—specifically whether Bergens' termination for misconduct was pretext for disability discrimination. Bergens' own testimony, the video footage, and other contemporaneous documentary evidence make it clear that he was terminated for a legitimate, non-discriminatory and non-retaliatory reason. Despite Bergens' ever-shifting narrative regarding what occurred, he has failed to create any genuine issue of material fact as to whether this legitimate reason was pretextual.

## A.    Standard of Review

Grants of summary judgment are reviewed de novo, "view[ing] all evidence in the light most favorable to the nonmoving party." *C.S. v. McCrumb*, 135 F.4th 1056, 1060 (6th Cir. 2025) (internal citation omitted). "Summary judgment for the [Company] is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Barr v. Lafon*, 538 F.3d 554, 561 (6th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). The Court seeks to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* (internal citation omitted). There is "no genuine issue as to any material fact" warranting submission to a jury "when the nonmoving party has failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 561–62 (citation altered).

In discussing the summary judgment standard, Bergens quotes from *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 810 (6th Cir. 2020):

"courts should be cautious in affirming summary judgment on discrimination claims…" Appellant's Br., R.27, PageID#: 52. However, Bergens inserts an ellipsis in his brief where a key portion of the court's instruction is found—he leaves out the requirement that pretext must first be shown. "Courts should be cautious in granting, and affirming, summary judgment on discrimination claims when the plaintiff has made a prima facie case *and a showing of pretext* because 'an employer's true motivations are particularly difficult to ascertain, thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage.'" *Willard*, 952 F.3d at 810 (quoting *Singfield v. Akron Metro. Hous. Auth.,* 389 F.3d 555, 564 (6th Cir. 2004)) (emphasis added). This principle from *Willard* is triggered only when a plaintiff establishes a prima facie case *and* makes a showing of pretext. Bergens is missing the second piece.

To the extent Bergens relies on *Willard* to suggest that discrimination claims are subject to a different summary judgment standard than other types of cases, such is contrary to Supreme Court precedent. *Reeves v. Sanderson Plumbing Prods., Inc.* 530 U.S. 133, 148 (2000) ("[W]e have reiterated that trial courts should not treat

31

discrimination differently from other ultimate questions of fact.") (internal citations and quotations omitted). Citing to *Reeves* (and other Supreme Court decisions), the *en banc* Eighth Circuit vehemently rejected the suggestion that summary judgment should "seldom" or "sparingly" be granted in discrimination cases or that it should only be granted "with caution." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011).

While caution may be appropriate, Judge Posner correctly observed that there is no special rule precluding summary judgment in employment discrimination cases that involve intent. *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997) (affirming summary judgment in a Title VII case); *see also Gordon v. United Airlines, Inc.*, 246 F.3d 878 (7th Cir. 2001) (Easterbrook, J., dissenting) (claiming majority's reversal of summary judgment in a Title VII age and race discrimination case applied a different summary judgment rule in cases of intent and credibility and asserting "there is no room for a thumb on the scale against summary judgment in any class of cases); *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997) (affirming summary judgment for defendants in ADEA case

and asserting "employment discrimination cases are not governed by a separate set of rules … and they remain amenable to disposition by summary judgment as long as there is no genuine dispute as to the material facts"). Summary judgment remains an appropriate vehicle to dispose of discrimination claims in this Circuit, even when pretext is the key issue. *See, e.g., Bashaw*, 130 F.4th at 542.

**B.    Bergen's has failed to show that the Company's legitimate, non-discriminatory and non-retaliatory justification for his termination was pretextual.**

As Bergens notes, this case falls under the category of cases analyzed under "the familiar *McDonnell Douglas* burden shifting framework." *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314 (6th Cir. 2023) (internal citation omitted). Under the *McDonnel Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. *Id.* Assuming the plaintiff can do so, the defendant then has the opportunity to proffer a legitimate, non-discriminatory reason for its actions. *Id.* Once the defendant has proffered a legitimate reason, the plaintiff must show that the "proffered reason is merely a pretext for unlawful discrimination" in order to prevail. *Id.* At all times, the plaintiff bears the burden of persuasion. *Bashaw*, 130 F.4th at 548 (citing *Graoch Assocs.*

33

*#33, L.P. v. Louisville/Jefferson Cnty. Metro Hum. Rels. Comm'n*, 508 F.3d 366, 371 (6th Cir. 2007)).

This case turns on the third step—establishing pretext. At the fundamental level, pretext "is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (quoting *Chen*, 580 F.3d at 400 n.4).

A plaintiff can refute the legitimate, nondiscriminatory reason articulated by an employer to justify an adverse employment action "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). Regardless of which option is used, the plaintiff retains the ultimate burden of producing "sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001) (alteration in original). "The sole question that matters" becomes "whether a reasonable juror could conclude that the plaintiff would have kept his job

34

if he was not in the protected class, and everything else had remained the same." *Hannon v. Louisiana-Pac. Corp.*, 784 F. App'x 444, 448 (6th Cir. 2019) (citation altered).

Had Bergens never suffered a stroke, he still would have been terminated for going through co-workers' possessions and lying about doing so during the investigation. Bergens' claim that he was "summarily fired" after "no investigation" simply does not hold water when compared with contemporaneous documentation and his own testimony regarding the incident.

The only conclusion a reasonable jury could reach is that Bergens was terminated for his breach of trust. The record simply does not show even a scintilla of evidence that the Company had an ulterior motive for his termination.

**C. Bergens' own testimony, and video footage of the incident, confirm that his termination was based in fact.**

Bergens now claims that the Company's justification for his termination "had no basis in fact." Appellant's Br., R.27, PageID#: 57. However, "[w]hen a plaintiff seeks to establish pretext by arguing that a stated reason was not based in fact, [he] must show that the facts

35

necessary for the employer's legitimate, non-retaliatory reason were false or never happened." *Bashaw*, 130 F.4th at 552.

Here, video footage shows Bergens searching his co-workers' personal bags. Furthermore, even if there were not video evidence of the event, Bergens himself admitted that he opened and searched Biddle's and King's bags to try and find moonshine, that he did so without their permission, and that King and Biddle were upset by his actions Bergens Dep., R.28, PageID#: 198–99, 204–05.

To the extent Bergens attempts to overcome the video evidence by recharacterizing the event, the video evidence clearly defeats such testimony. When an exhibit contradicts allegations, the exhibit controls. *Williams v. CitiMortgage, Inc.,* 498 F. App'x 532, 536 (6th Cir. 2012) (internal quotations omitted) ("[W]hen a written instrument contradicts allegations…the exhibit trumps the allegations."); *see also Creelgroup, Inc. v. NGS Am. Inc.*, 518 F. App'x 343, 347 (6th Cir. 2013) (same); *Perkins v. Hininger*, No. 3:21-CV-00901, 2023 WL 4687196, at *6 (M.D. Tenn. July 21, 2023) (granting motion to dismiss based on contractual document attached to defendant's motion that were central to plaintiff's claims); *James v. Petra Fin., LLC*, No. 15-2297-STA-CGC, 2015 WL

36

7289430, at *6 (W.D. Tenn. Nov. 178, 2015) ("[p]laintiffs' allegation is not entitled to any presumption of truth because the written instrument itself contradicts the allegation and therefore trumps any fact pleading to the contrary.").

The Supreme Court emphasized this point in *Scott v. Harris*, while examining the level of credence due to a non-movant's testimony, when such testimony is a "visible fiction." 550 U.S. 372, 381 (2007). The Court highlighted that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. Accordingly, in *Scott*, where the non-movant's version of events was contradicted by a video of the events in question, the Court viewed the facts in light of the evidence presented by the moving party. *Id.* at 379–81. Similarly, in the context of ADA discrimination, the Sixth Circuit has found an employee's testimony "fails to create a genuine dispute of fact" where such testimony is "'so utterly discredited by the record that no reasonable jury' could believe it." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 769 (6th Cir. 2015) (internal citation omitted).

37

Bergens' attempts to claim that the events leading up to his termination were "false" or "never happened" simply buckle under the weight of video evidence and his own testimony that such conduct occurred. Accordingly, the proffered reason is unquestionably based in fact (in this case video footage), and thus Bergens cannot rely on the first method of proving pretext.

**D.    The Company fired Bergens solely due to the moonshine incident and his lies during the subsequent investigation.**

Bergens next attempts to use the second method of proving pretext. Under this method, he "admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal," but "attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). "This method . . . is not identical to a *prima facie* case. Rather, it requires the plaintiff to submit additional evidence." *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006). Under this option, Bergens "must offer additional evidence of a

38

causal connection sufficient to allow a reasonable jury to disbelieve the [Company's] explanation for [his] termination." *Id.* at 796.

Bergens has four theories here: (1) that the temporal proximity between his stroke and termination indicates pretext; (2) that he was subjected to a hostile and discriminatory environment; (3) that *he believes* the Company had already decided to replace him even before he was caught meddling with co-workers' possessions; and (4) that no investigation was conducted.

### 1. Bergens intervening misconduct breaks any causal inference offered by temporal proximity.

Bergens argues that the temporal proximity between his stroke and his termination is evidence that his disability caused his termination. Appellant's Br., R.27, PageID#: 59–60. However, "temporal proximity alone is generally not enough to establish . . . causation." *Wingo*, 815 Fed. Appx. at 47 (citing *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 629 (6th Cir. 2013)). "This is especially so when an intervening act disrupts the purported causal chain between a protected act and an adverse employment action." *Wingo*, 815 Fed. Appx. at 47 (citing *Kuhn*, 709 F.3d. at 628). An employee's own misconduct serves "as an 'intervening cause' for his termination, which negate[s] any potential

39

inference drawn from the temporal proximity." *Wingo*, 815 Fed. Appx. at 47.

Here, Bergens' lapse in judgment in going through his co-workers' belongings disrupts the purported causal chain. *Id.* His intervening conduct negates any potential causal inference that could be drawn from the temporal proximity, and thus, it cannot be used to show pretext.

Furthermore, even if Bergens was able to establish a causal connection through temporal proximity, which he cannot, "temporal proximity cannot be the sole basis for finding pretext. So the [plaintiff] needs more to reach a jury." *Ford Motor Co.*, 782 F.3d at 767 (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012) (citation altered). As discussed in detail below, Bergens has failed to offer the requisite accompanying indicia of unreliability. So even if Bergens showed temporal proximity, such a showing would not create a genuine question of fact sufficient to reach a jury.

### 2. The record and Bergens own testimony show he was not subjected to a hostile or discriminatory work environment.

Bergens next claims he was subject to hostile and discriminatory behavior, pointing to questions Delahunt, MacDonald, and Perham asked

40

him regarding his ability to perform, and pointing to stray comments from non-decision-makers, such as King, calling Bergens the "one arm bandit" and similar names.  Appellant's Br., R.27, PageID#: 60–61. This Circuit's caselaw and the text of the ADA itself make it clear that such a strategy is without merit.

Turning first to the questions asked by Delahunt, MacDonald, and Perham, as a threshold matter, the ADA explicitly allows employers to make inquiries regarding an employee's ability to perform essential functions of their job. 42 U.S.C. § 12112(d)(4)(B) ("A covered entity may make inquiries into the ability of an employee to perform job-related functions.") (emphasis added). *See also* 29 C.F.R. § 1630.14(c).

Furthermore, caselaw is clear that the accommodation process is an "interactive discussion" and a "dialogue." *Ford Motor Co.*, 782 F.3d at 766. As such, employers have a clear duty to "engage in the ADA's mandatory interactive process." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 421 (6th Cir. 2020). Additionally, "the interactive process requires communication and good-faith exploration." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (internal citation omitted).

Here, Bergens indicated that he initially had unrealistic expectations for how swiftly he would recover and had to reassess his own capabilities and timeline in his head as the weeks progressed. Bergens Dep., R.28, PageID#: 206–07. He further admits that Delahunt's perception of his disability could have been influenced by his own communications to Delahunt about his estimated timeline for recovery. Bergens Dep., R.28, PageID#: 206. It should come as no surprise that Delahunt needed to make occasional inquiries as to Bergens' ability to perform the essential functions of his job, as explicitly allowed by the plain language of the ADA, to engage in the interactive process in good faith and ensure the proper accommodations were being considered based on Bergens' own shifting understanding of his health and limitations.

Furthermore, it is curious that Bergens takes issue with these questions, but in almost the same breath claims that a *lack* of discussion about accommodations is also proof that he was discriminated against. It defies logic that leadership somehow discussed his needs too much while simultaneously not discussing his needs at all and that both of these

42

diametrically opposed facts are evidence of pretext. Appellant's Br., R.27, PageID#: 60,63.

Turning next to the alleged discriminatory remarks, there were no discriminatory remarks and there was no discriminatory atmosphere. Bergens did not find the "one arm bandit" comments to be discriminatory or even unwelcome—he found them "funny" and never complained about them. Bergens Dep., R.28, PageID#: 190–91. An employee must view comments as "subjectively" unwelcome or abusive to violate Title VII. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993).

But even putting Bergen's perception of the comments aside, Perham's reference to Bergens as a "one armed bandit" on one or two occasions, Bergens Dep., R.28, PageID#: 191, is insufficient to prove pretext. Perham did not make the decision to terminate Bergens— Delahunt did. "Actions by nondecisionmakers cannot alone prove pretext." *Ford Motor Co.*, 782 F.3d at768. Even comments made by decisionmakers "outside of the decisionmaking process" are insufficient to establish pretext. *Id.* Compare *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) (finding that "allegedly discriminatory comments made by company officials who had nothing to do with Bush's

43

termination, or alleged conduct by Bush's supervisors that was either remote in time or of unarticulated relevance" could not establish pretext), and *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548-50 (6th Cir. 2004) (finding that remarks by decisionmakers and nondecisionmakers outside the decisionmaking process did not show that other well-supported reasons for termination were pretextual), with *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 323–24 (6th Cir. 2019) (finding a dispute as to pretext where a "smoking gun" email was written at the direction of a key decisionmaker almost immediately after the plaintiff's termination), and *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998) (finding a genuine dispute as to pretext where both decisionmakers and other senior employees made comments hostile toward older workers shortly before the plaintiff's position was eliminated). Perham's alleged comments about Bergens were made outside of the investigation and outside of the decisionmaking process. Bergens cannot rely on them to show pretext.

In sum, neither the alleged discriminatory comments nor leadership's questions regarding Bergens' needs are sufficient to support

44

a finding of pretext. Indeed, in asking Bergens questions regarding his disability, the Company was fulfilling the mandate of the ADA.

### 3. The Company stuck to its plan to promote Bergens after the stroke.

Bergens alleges that the Company backed off the plan to promote him to GM after his stroke. Appellant's Br., R.27, PageID#: 51. However, the facts do not support Bergens' claim that Delahunt and MacDonald "repeatedly signaled their intention to cut Bergens out." Appellant's Br., R.27, PageID#: 51. In fact, the record supports the opposite conclusion: that Delahunt and MacDonald intended to promote Bergens according to the plan established before his stroke. Even Bergens admits that he "was still slated to be the GM [at the new restaurant] until" he went through his co-workers' bags without their permission. Bergens Dep., R.39-1, PageID#: 1397.

Bergens' contention that he was excluded from the planning process is undercut by documentary evidence and his own testimony. Delahunt testified that after Bergens returned to work from medical leave, he asked MacDonald to invite Bergens to a marketing meeting for Blue Moose Alcoa to "talk about going into the schools and getting involved in the community." Delahunt Dep., R.39-1, PageID#: 1469-70. That

45

marketing meeting occurred on October 18, the day before Bergens was terminated. Bergens Dep. Exh. 6, R.28, PageID#: 269.

But it was MacDonald who worked more closely with Bergens with respect to his future role at Blue Moose Alcoa. The two exchanged a series of text messages (see table below) for over a month after Bergens' stroke, many of which related to Bergens' new position as GM of Blue Moose Alcoa. Bergens Dep. Exh. 6, R.28, PageID#: 226–70.

| Date | Subject | Record Citation |
| --- | --- | --- |
| September 2 | Opening week sales projections and layout of Blue Moose Alcoa | Bergens Dep. Exh. 6, R.28, PageID#: 244–45. |
| September 12 | Labor requirements for Blue Moose Alcoa | Bergens Dep. Exh. 6, R.28, PageID#: 247–49. |
| September 15 | Partnering with local schools | Bergens Dep. Exh. 6, R.28, PageID#: 251. |
| September 26 | Memorabilia for Blue Moose Alcoa decor | Bergens Dep. Exh. 6, R.28, PageID#: 254. |
| September 28 | Hiring for Blue Moose Alcoa | Bergens Dep. Exh. 6, R.28, PageID#: 255–58. |
| September 29 | Hiring for Blue Moose Alcoa | Bergens Dep. Exh. 6, R.28, PageID#: 258. |
| September 30 | Construction for Blue Moose Alcoa's building and business cards | Bergens Dep. Exh. 6, R.28, PageID#: 260–61. |
| October 18 | Marketing meeting for Blue Moose Alcoa | Bergens Dep. Exh. 6, R.28, PageID#: 269 |

46

Adopting Bergens' theory would require a conclusion that MacDonald's communications (right up until the day before Bergens was terminated) were nothing more than a facade to mask intentional discrimination. There is no support in the record for such a conclusion.

Next, Bergens claims that no one ever discussed accommodations with him for when he would take over as general manager at Blue Moose Alcoa. However, Bergens testified that his condition was changeable. Bergens Dep., R.32-6, PageID#: 1198–99. Thus, it would have been difficult for the Company to establish exactly what Bergens accommodation needs were until closer to the time he moved to the Alcoa location, when those needs for accommodation solidified. He further testified that he never made anyone aware that he needed accommodations for his transfer to the Alcoa location. Bergens Dep., R.32-6, PageID #: 1219–20.

Bergens goes on to theorize that the Company hired Coppinger specifically to replace him. Once again, the record does not support Bergens' theory. The decision to have Coppinger take over as GM at Blue Moose Alcoa was not made until *after* Bergens' termination. MacDonald Dep., R. 39-1, PageID#: 1564. Moreover, as of October 13 (six days before

47

termination), the Manpower Planning spreadsheet for Blue Moose Alcoa listed Bergens as the managing partner, also known as the general manager, MacDonald Dep., R. 39-1, PageID#: 1564, and Coppinger was listed as an assistant manager. MacDonald Dep. Ex. 17, R.28, PageID#: 419–20. Bergens' theory is nothing more than pure speculation, without any support in the record.

Bergens then claims that the Company's decision not to move Mandy Benton to the Alcoa location is evidence of pretext. Appellant's Br., R.27, PageID#: 63–64. Bergens never "recommended" Brenton to be an assistant manager at Blue Moose Alcoa. Instead, he advised MacDonald that Brenton had told him that she would like to work at Blue Moose Alcoa. He went on to say: "I'm not sure if we transfer like that. Just letting you know." Bergens Dep. Exh. 6, R.28, PageID#: 257. There was no *request* from Bergens to transfer Brenton. Regardless, the fact that the Company did not hire Brenton at Blue Moose Alcoa does nothing to undercut the Company's stated reason for terminating Bergens.

Bergens' current version of events is contradicted by the record and his own prior testimony. As discussed above, when the non-movant's version of events is a "visible fiction," "which is blatantly contradicted by

48

the record," the court ought not to give it credence. *Scott*, 550 U.S. at 380–81. Where documentary evidence clashes with testimony, the law of this Circuit is clear that the exhibits trump the allegations. *Williams,* 498 F. App'x at 536; *Creelgroup, Inc.,* 518 F. App'x at 347; *Perkins,* 2023 WL 4687196 at \*6; *James,* 2015 WL 7289430 at \*6. Thus, the district court did not err in finding that the contemporaneous documentation defeats Bergen's latest version of events.

### 4. The Company investigated Bergens' conduct and terminated him after he admittedly lied during the course of the investigation.

Finally, Bergens claims that there was no investigation into his conduct, which is once again contradictory to the record.

The Company's investigation is set out in the record. On October 19, 2022, MacDonald informed Delahunt that Bergens was caught on video going through the bags of Biddle and King without their permission and that they were upset. Delahunt Dep., R. 28, PageID#: 276. Delahunt and MacDonald then conducted a phone call with Perham. Delahunt Dep., R. 28, PageID#: 276. Perham confirmed the facts that had previously been relayed to Delahunt by MacDonald. Delahunt believed this to be a "serious issue." Delahunt Dep., R. 28, PageID#: 276. Delahunt

49

and MacDonald watched the video showing Bergens going through Biddle's bag and King's bag. Delahunt Dep., R. 28, PageID#: 276. After watching the video, Delahunt and MacDonald had a "long conversation" about what to do in response. Delahunt Dep., R. 28, PageID#: 276. Delahunt testified as follows about this conversation:

> It was pretty cut and dry. It was, you know, this guy is going through other managers' bags without permission. We have managers that are furious, and even if we want to, we have a responsibility to the rest of the employees in the building, because they're going to learn of what happened, and then ultimately, even beyond that, when we go to Blue Moose, we're going to hire 120 employees, give or take, and they're going to know about it, because that's the way the restaurant business works, and that's going to cause an issue hiring and/or just securing the trust of those employees and securing the trust of those two managers, the other managers, and all of the employees of Timberwood, and we decided there's nothing we can do. It's cut and dry.

Delahunt Dep., R. 28, PageID#: 276.  Delahunt explained that Bergens' actions on the video "showed a tremendous lack of judgment and character and that we couldn't continue his employment because of that." Delahunt Dep., R. 28, PageID#: 279. Bergens also lied about his actions on three separate occasions. Delahunt Dep., R. 28, PageID#: 276; MacDonald Dep., R.28, PageID#: 329. Based on the foregoing, Delahunt

50

"made a reasonably informed and considered decision before" making the decision to terminate Bergens. *See Wright v. Murray Guard*, Inc., 455 F.3d 702, 707 (6th Cir. 2006).

To the extent Bergens claims that the Company could have or should have taken other steps to investigate this matter, such an argument falls flat. The Sixth Circuit has rejected arguments that the employer must exhaust every avenue in an investigation. *See Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286 (6th Cir. 2012); *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 286 (6th Cir. 2012) ("However, as we have already noted, an 'optimal' investigation—i.e., interviewing the employee and some or all of his witnesses—is not a prerequisite").

Additionally, Delahunt and MacDonald believed that they had all the facts they needed at the time the decision to terminate was made. They knew Bergens' co-workers were upset about him searching their bags. They knew the video footage supported the co-workers' version of events. And they knew Bergens' behavior showed a tremendous lack of judgment which they simply could not allow to stand. Delahunt Dep., R.28, PageID#:   at 26-27. Delahunt Dep., R.28, PageID#: 279, 297;

51

MacDonald Dep., R.28, PageID#: 329. As a result, Delahunt and MacDonald believed that Bergens must be terminated. Bergens now claims there was more to the story that should have been considered. However, Courts "'look at the facts as they appear to the person making the decision to terminate [the employee],' not at 'the employee's subjective [beliefs]." *Ford Motor Co.*, 782 F.3d at 768 (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir.2000)). Bergens' subjective belief that there were additional facts that needed to be considered, does not belie the fact that certain facts made it seem to Delahunt and MacDonald that they could not trust Bergens any longer.

To the extent Bergens claims some form of progressive discipline was necessary in response to his misconduct, this argument, like his others, falls flat. The Company did not abandon its own processes and policies. The Company's Disciplinary Action Policy provides that it "reserves the right to terminate an employee at any time for any reason without prior disciplinary counseling or notice." Employee Handbook, R.39-1, PageID#: 1488. Here, Bergens' breach of trust warranted his dismissal. This Court has been recognized that "an employer may terminate an employee whose actions undermine the employer's trust. 'It

is also obvious that, at a bare minimum, companies must be able to trust their employees ... and must be able to discharge ... an untruthful employee.'" *Bashaw*, 130 F.4th at 549 (citing *6 W. Corp. v. N.L.R.B.*, 237 F.3d 767, 778 (7th Cir. 2001). Accordingly, Bergens' termination for a breach of trust aligns with what this Court has previously considered appropriate.

### E.   Bergens cannot identify a comparator.

Finally, Bergens tries, and fails, to show pretext under the third option—insufficient reason to justify termination. The third pretext option generally "consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer,* 29 F.3d at 1084. The Sixth Circuit has explained that "the plaintiff and the employee with whom the plaintiff seeks to compare himself must be similar in all of the relevant aspects" in order for the two to be similarly-situated. *Ercegovich,* 154 F.3d at 352. A plaintiff usually is required to "show by a preponderance of the evidence that other employees, particularly employees not in the protected class, were not fired even

53

though they were engaged in substantially identical conduct to that which the employer contends motivated its discharge of [the plaintiff]." *Blizzard*, 698 F.3d at 286–87. This also generally requires that a plaintiff and those employees with whom he seeks to compare himself must have dealt with the same supervisor. *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992). Meeting this standard at the pretext stage, as opposed to the *prima facie* stage, requires an even "closer correlation" between the plaintiff and his comparators. *Miles*, 946 F.3d at 894.

In his brief, Bergens identified three potential comparators. However, it is clear there were no individuals who were similarly situated to Bergens "in all of the relevant aspects," as the law requires.

### 1. Robert Cartree

Bergens alleges that Robert Cartree, a bar supervisor at Timberwood Grill, put bottlecaps in King's bag at some point in the past. Bergens Dep., R.28, PageID#: 200. Cartree is not, however, similarly situated to Bergens. Cartree and Bergens held different positions and different levels of responsibility. Cartree was a bar supervisor, who worked directly under King, who was an assistant manager. Bergens Dep., R.28, PageID#: 200.  Unlike Bergens, he had not been tapped to be

the GM of a new restaurant. Cartree did not engage in the same type of misconduct as Bergens did. Bergens testified that Cartree put bottle caps in King's bag, and that King laughed about it. Bergens Dep., R.28, PageID#: 205. Bergens testified that he looked in Biddle's and King's bags to try and find moonshine Bergens Dep., R.28, PageID#: 204, and that King and Biddle were upset by his actions Bergens Dep., R.28, PageID#: 205.

Delahunt made the decision to terminate Bergens' employment after he went through two employees' bags without permission, which Delahunt believed would impair Bergens' ability to be trusted by other employees, both at Timberwood Grill and the soon-to-open Blue Moose Alcoa. Delahunt Dep., R.28, PageID#: 276.) With the bottlecap situation involving Cartree, there was no loss of trust and there were no employees who were upset. In fact, King never complained or reported the bottlecap incident. King Dep., R.28, PageID#: 303. There is no evidence that Delahunt was aware of the bottle cap incident with Cartree until *after* Bergens' termination. And unlike Bergens, Cartree did not lie about his actions when questioned. Delahunt Dep., R.28, PageID#: 282; MacDonald Dep. Ex. 19., R.28, PageID#: 421.

55

### 2. Daniel King

Bergens alleges that two other managers, Daniel King and Mike, whose last name Bergens could not recall, arranged food in the expo area of the restaurant in shapes to resemble male genitalia but were not terminated. Bergens Dep., R.28, PageID#: 200. This act, while inappropriate, is not "substantially identical" to what Bergens did. Moreover, neither of these employees were selected to take over the additional responsibilities of serving as a General Manager.

### 3. Jack Coppinger

Jack Coppinger was selected to work as the General Manager of the Blue Moose Alcoa after Bergens' termination. MacDonald Dep., R.28, PageID#: 331. Coppinger was previously training as an Assistant Manager at the Blue Moose Pigeon Forge in anticipation of transferring to work as an Assistant Manager at the Blue Moose Alcoa. MacDonald Dep., R.28, PageID#: 331; Delahunt Dep., R. 28, PageID#: 290–91. However, in November of 2022, while training, he was in a consensual relationship with a server which resulted in the server becoming pregnant. MacDonald Dep., R.28, PageID#: 331. The server did not transfer with him to the Blue Moose Alcoa. MacDonald Dep., R.28,

56

PageID#: 331–32. Delahunt testified that after Bergens was terminated, the Company knew that "finding somebody from the outside at that late of a date was going to be a challenge in that time frame" and they decided at that point, they "had no choice" but to tap Coppinger to be the General Manager of the Blue Moose Alcoa. Delahunt Dep., R.28, PageID#: 294.

Coppinger was subsequently demoted as the General Manager of the Blue Moose Alcoa in May 2023 because he was unprofessional and immature with the staff, as well as ineffective at the financial aspects of the position. MacDonald Dep., R.28, PageID#: 331. The conduct Coppinger allegedly engaged in is not "substantially identical" or even similar to Bergens' misconduct. As a result, Coppinger does not qualify as a comparator to Bergens for purposes of this pretext analysis.

## F. The honest-belief rule applies.

The Sixth Circuit has adopted a modified honest-belief rule, which applies here at the pretext stage. *See Wright*, 455 F.3d at 707–08 (explaining the modified honest-belief rule as, "so long as the employer honestly believed in the proffered reason, an employee cannot prove pretext even if the employer's reason in the end is shown to be mistaken, foolish, trivial, or baseless," provided the employer can "establish its

57

reasonable reliance on the particularized facts that were before it at the time the decision was made"); *Blizzard*, 698 F.3d at 286.

When Delahunt was making the decision to terminate Bergens' employment, he considered the particularized fact of Bergens' actions captured on the video. To his superiors, Bergens' actions "showed a tremendous lack of judgment and character." Delahunt Dep., R. 28, PageID#: 279, 297; MacDonald Dep., R.28, PageID#: 329. And when Bergens' explanation of the incident did not align with the video footage his superiors had already watched, that tanked his credibility. *Id*. Based on the foregoing, Delahunt "made a reasonably informed and considered decision" to terminate Bergens. *See Wright*, 455 F.3d at 707.

To the extent Bergens claims that the Company could have or should have taken other steps to investigate this matter, such an argument falls flat. A company does not have to employ a "no stone left unturned" approach in an investigation to avail itself of the honest belief rule; it just has to make a reasonably informed decision. *See Blizzard*, 698 F.3d at 286 ("MTC is entitled to the protections of the honest belief rule because it has shown that it made a reasonably informed and

58

considered decision to terminate Blizzard's employment."); *Seeger*, 681 F.3d at 286..

Bergens' claim that he was subjected to discrimination after his stroke is belied by the facts, and in particular, the text messages between him and MacDonald where MacDonald expressed nothing but concern and compassion to him. Once Bergens returned to work, MacDonald and Delahunt continued with their plan to promote Bergens to the GM of the Blue Moose Alcoa. MacDonald Dep., R.28, PageID#: 325–26, 328. Bergens' stroke is not the reason he was not promoted and was ultimately terminated.

## CONCLUSION

Bergens—despite his various attempts—has failed to show that the Company's reason for terminating his employment was pretextual. Summary judgment should be affirmed.

Date: September 22, 2025          Respectfully submitted,

/s/ Brandon L. Morrow
Brandon L. Morrow
(Tenn. Bar No. 031242)
KRAMER RAYSON LLP
P.O. Box 629
Knoxville, TN 37901-0629
bmorrow@kramer-rayson.com
*Counsel for Appellees*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the proof brief filed in this appeal complied with the type-volume limitation provided in Fed. R. App. P. 32(a)(7)(B) in that the proof brief contained 10,155 words of Century Schoolbook 14-point proportional type.  The word processing software used to prepare this brief was Microsoft Word 2013.

/s/ Brandon L. Morrow

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of September 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may gain access to this filing through the Court's electronic filing system.

/s/ Brandon L. Morrow

# ADDENDUM

## Designation of Relevant District Court Documents

### Case #: 3:23-CV-00304-DCLC-DCP

| Date | Entry | Record Document | Page ID ## Range |
|---|---|---|---|
| 10/21/2024 | 28[1] | Delahunt Declaration | 179–80 |
| 10/21/2024 | 28 | Armbrester Deposition Excerpts | 181–85 |
| 10/21/2024 | 28 | Bergens Deposition Excerpts | 186–213 |
| 10/21/2024 | 28 | Exhibits to Bergens Deposition | 214–73 |
| 10/21/2024 | 28 | Delahunt Deposition Excerpts | 274–89 |
| 10/21/2024 | 28 | King Deposition Excerpts | 299–314 |
| 10/21/2024 | 28 | Exhibits to King Deposition | 315–17 |
| 10/21/2024 | 28 | MacDonald Deposition Excerpts | 318–35 |

---

[1] This and other addendum documents are parts of larger docket entries that contain many distinct documents. Descriptions of the individual documents are listed here and in the brief for greater clarity.

| Date | Entry | Record Document | Page ID ## Range |
|---|---|---|---|
| 10/21/2024 | 28 | Exhibits to MacDonald Deposition | 336–421 |
| 10/21/2024 | 28 | Perham Deposition Excerpts | 422–37 |
| 10/21/2024 | 28 | Exhibits to Perham Deposition | 438–56 |
| 11/25/2025 | 32–6 | Bergens Deposition Excerpts | 1099–1231 |
| 12/06/2024 | 39–1 | Bergens Deposition Excerpts | 1390–1415 |
| 12/06/2024 | 39–1 | Exhibits to Bergens Deposition | 1416–61 |
| 12/06/2024 | 39–1 | Delahunt Deposition Excerpts | 1462–75 |
| 12/06/2024 | 39–1 | Exhibit to Delahunt Deposition | 1476–1546 |
| 12/06/2024 | 39–1 | King Deposition Excerpts | 1547–57 |
| 12/06/2024 | 39–1 | MacDonald Deposition Excerpts | 1558–65 |
| 12/06/2024 | 39–1 | Exhibits to MacDonald Deposition | 1566–67 |
| 12/06/2024 | 39–1 | Perham Deposition Excerpts | 1568–77 |
| 02/03/2025 | 62 | Judgment | 1779 |
| 02/28/2025 | 64 | Plaintiff's Notice of Appeal | 1789–90 |